[Crim. No. 22009. Mar. 25, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER SCOTT TOWLER, Defendant and Appellant.

106

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Julia Cline Newcomb, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Vincent J. Scally, Robert D. Marshall and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, J.**—Defendant Christopher Towler appeals from a conviction of second degree murder, contending principally that the evidence introduced at trial was insufficient either to establish the corpus delicti of the crime or to support his conviction. We conclude that the evidence is sufficient in both respects and affirm.

### I.

The record, viewed in the light most favorable to the judgment below (see *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]), reveals the following facts.

In the summer of 1977, Ron Stone, the victim, began working as a drug informant. Shortly thereafter, Stone introduced two undercover narcotics agents to Towler for the purpose of setting up a sale by Towler to the agents. In October 1977, Towler sold cocaine to the offi-

cers. A few weeks later he was arrested and later convicted of selling cocaine.

Both before and after his arrest and conviction, Towler told a number of people that he hated "snitches" and thought they should be killed. In a telephone conversation that took place between the sale and the arrest and which was recorded without his knowledge, Towler told Robert Burns, one of the agents, that "Your friend [Stone] is pretty bad people, man ... he's just [an] out and out snitch .... He's working for the cops, and he's bragging that ... supposedly he set me up ... with two guys from Sacramento." After the agent said, "I gotta watch myself then, if he [Stone] ever comes around to me, man," Towler replied, "I don't know, man, I don't think he's gonna be living up here very much longer." Later in the conversation Towler said: "[Stone's] liable to get his ass stomped pretty good because he's been talking a lot of shit about a lot of people ... and I'm sorry to hear that he's a friend of yours, man, but I don't fuck around."

A short time after that conversation, Towler was arrested and remained in jail until he had pleaded guilty to the drug sale charges. He was released on bail on December 31, 1977, pending sentencing which was originally set for January 17, 1978. Towler did not appear in court on January 17, but did appear the following week on January 24. Two days earlier Stone had disappeared. Between December 31, 1977, and Stone's disappearance on January 22, Towler told a number of people on several occasions that he was going to jail because of Stone and that he intended to get even with him. Gayle Burkhart testified that during this period of time Towler "always said that Ron was going to get it, or get even with Ron." When asked if Towler said how Ron was going to "get it," she stated: "Well, you know, that he should be killed. He should be, you know, done with, you know, because nobody deserves to be busted and all that stuff; and, he thought it was right for Ron, you know, to be killed." When asked if Towler had said who might do the killing, Burkhart testified: "What he said was that when he went to jail somebody was supposed, you know, do something to Ron, get Ron, you know, while he was in jail." Asked whether Towler had ever said anything about "disposing of Ron, so he would never be found," Burkhart stated that Towler had said "he needed to be disposed of, so he wouldn't be found ... [H]e said ... that when Ron, you know, when Ron was going to get it, it would like—it would be an accident; and when the body was found, there would be no evidence, you know, or it would be so gone, you know, that nobody would know how it was done."

Susan MacDonald, a neighbor of Stone's, stated that late one evening when she met Towler sitting outside of Stone's motel room, Towler told her "that Ron had snitched him off, and that he was going to pay back Ron Stone for doing so."

Steven Konoff, a student at the University of Pacific who met Towler on a weekend visit to Sonora in January 1978, testified that Towler told him that he had been set up by an informant, that he had gotten into a fight with him "and that he was going to get this guy—got him good that night, and he was going to get him again." Towler said that "he had a plan to get this guy," and although he did not elaborate on the plan, "he did say he was going to get him before he went to prison."

In the late evening hours of Friday, January 20 or the early morning hours of Saturday, January 21, the day before Stone was last seen alive, Towler and several friends went to the motel room where Stone lived with his roommate Randy Schoeppner. Towler took Schoeppner outside the room and told him he was living with a snitch. The two went back into the room and after some drinking, Towler and Stone got into an argument and fight in which Towler hit Stone across the face with a bottle, knocking Stone's glasses off and cutting his nose. Towler picked up the glasses "and crunched them." Schoeppner testified that during the fight Towler called Stone a "snitch" and told him that he "was dead."

Towler and several friends then left Stone's motel and went to Joan Rouse's house. After a few hours they all decided to have an early breakfast at the Happy Kup restaurant, where Stone was employed as assistant manager. On their way to the restaurant, at Towler's sugges- tion, they stopped at the motel room to pick up Stone. Rouse testified that at the time Stone acted "scared." During the breakfast Towler joked about Stone's broken glasses, using the lens as a monacle. Stone seemed uncomfortable. At the Happy Kup Stone paid for everyone's meal by signing the tab; he did not, however, follow the established pro- cedure of consulting the manager before doing so. Stone left the restaurant alone, before the rest of the party.[1]

---

[1]There was contradictory testimony regarding the dates of the fight and breakfast, the defense contending that the "altercation" occurred at least a week before Stone dis- appeared. However, there was substantial evidence to support the prosecution's theory that these events occurred on the eve and early morning of the 21st and 22d.

That night, Saturday, January 21, 1977, Stone worked his usual 8 p.m. to 4 a.m. graveyard shift at the Happy Kup. That same night, in anticipation of Towler's upcoming sentencing, there was a going-away party for him at a local tavern. Dan Roland was at the party. Towler talked to him about being angry at Stone and wanting "to kick his ass." Roland denied, however, that Towler asked for his help in getting even with Stone.

After the party, Roland went directly to the Happy Kup where he asked Stone if after work he wanted to take a ride to "party" with some drugs Roland had. Stone agreed and left the restaurant with Roland some time after 4 a.m. on Sunday, January 22. Roland testified that he and Stone just drove around for about an hour or an hour and a half, drinking beer and smoking marijuana, and that he dropped Stone at the Happy Kup's parking lot before 6 a.m.[2] Randy Schoeppner, Stone's roommate, testified, however, that Stone returned to the motel room briefly between 4 and 5 a.m. that morning to pick up a jacket. As Stone was leaving, Schoeppner glanced out the window and saw Roland's car parked out front. Towler was sitting either in the right front passenger seat or in the rear seat of Roland's car, but Schoeppner was unable to see who was in the driver's seat.[3] After Stone closed the motel door, Schoeppner heard the car door slam and the vehicle pull away.

Stone was never seen again. A coworker testified that Stone was supposed to have picked him up at the Happy Kup that morning at 6 a.m., but never showed up. When Stone failed to report to work that night, another coworker informed the employer that Stone had told her that the police should be notified if he did not show up for work. The employer called the police.

Stone's body was found two months later in a remote area about eight miles from Sonora on the bank of the Stanislaus River. Stone had not had a working car or motorcycle, and thus probably had been taken to the river by someone else. The body was clad in the same clothes that Stone had been wearing when he left the Happy Kup with Roland in the morning of January 22. A knife was found in a pocket, but the wallet that Stone usually carried was missing.

[2]Roland was indicted along with Towler in connection with Stone's death. Roland went to trial first and received a directed verdict of acquittal. The record in the case at bar does not reveal what evidence was presented at Roland's trial.

[3]Later in the trial, the day after he had been given a place to sleep for a night by Towler's girl friend, Schoeppner changed his testimony and stated that he had not actually seen Towler but only the back of someone's head.

Because of the deterioration of Stone's body over the two-month period, the examining doctors could not determine the actual cause of death. Although the doctors concluded that he probably was not shot, stabbed or strangled, they could not rule out a drug overdose, suffocation, or drowning.

After Stone's body was found, a police officer questioned Towler —who was then serving time on the drug charges at a drug rehabilitation facility—about the death, asking whether he thought it was possible that he could have been involved in Stone's murder. Towler replied: "I guess I could have been, man, I don't know. Never shot anyone in my whole life. Never stabbed anyone. Only thing I've ever done is hit someone with my hand."

A search of Towler's footlocker at the drug rehabilitation facility revealed a hand-drawn map of the area around Sonora where Stone's body was found. There were several stars on the map, one of which appeared to mark the location of the Stanislaus River. Towler admitted drawing the map, but explained that he had done so as part of a metric conversion exercise in his auto mechanics class at the facility.

Towler presented an alibi defense with respect to his whereabouts during the early morning hours of January 22, when Stone apparently disappeared and when Schoeppner initially testified that he had seen Towler in Roland's car. A friend of Towler's testified that about 2:30 a.m., after the going-away party, he and another man took a very intoxicated Towler home to Towler's girl friend's apartment. Towler's girl friend testified that she arrived home between 2:30 and 3 a.m. and found Towler asleep in bed. Towler's uncle testified that he went to the girl friend's apartment around 6:10 a.m. that morning to look for his sister who sometimes stayed there, and that he awakened Towler at that time. Towler took the stand and testified that he had last seen Stone at their breakfast at the Happy Kup and that he did not kill Stone.

The defense also presented evidence to suggest that Stone may not have been murdered, but may either have accidentally drowned while under the influence of drugs or committed suicide. One of the doctors called by the prosecution, who had experience treating patients who had used the drug PCP, stated that "people who take PCP like going swimming . . . and then, under the water they get confused which way is up and which way is down. They continue to swim and don't come up, and

they keep swimming happily on the bottom; and they never come up." A number of defense witnesses testified that Stone regularly used marijuana and alcohol and several stated that they believed he also occasionally used amphetamines and PCP. One defense witness testified that Stone had been depressed for several months before his disappearance and that on several occasions during this period he spoke of committing suicide.

Finally, the defense presented a number of witnesses in an attempt to impeach Gail Burkhart, who had testified about Towler's admissions concerning a plan to kill Stone. The defense witnesses stated that Burkhart was a rejected lover of Towler's and that she had told them that she was testifying against him for revenge.

After considering all the evidence, the trial court, sitting without a jury, found Towler guilty of second degree murder. Although it acknowledged that there were many conflicts in the evidence and that the medical testimony did not establish the cause or manner of death, it concluded that after taking into account the testimony of all the witnesses it was convinced beyond a reasonable doubt that Towler was responsible for the murder of Stone. Following the preparation of a probation report, the court sentenced Towler to the middle term, then six years.

On appeal, Towler challenges the conviction on a number of grounds. First, he contends that the evidence at trial was insufficient either to establish the corpus delicti of the crime or to support his conviction. Second, he maintains that because the prosecutor improperly intruded on the confidentiality of an attorney-client communication, the action should be dismissed. Finally, he claims that several alleged irregularities in the grand jury proceedings which led to his indictment warrant the reversal of the judgment.

## II

Towler claims that the evidence at trial was insufficient in two distinct respects. First, he asserts that the evidence—exclusive of his extrajudicial statements—failed to establish the corpus delicti. Second, he maintains that the evidence as a whole does not support a finding that he was guilty of murder. We discuss each of the contentions in turn.

## A.

In a prosecution for murder, as in any other criminal case, the corpus delicti—i.e., death caused by a criminal agency—must be established independently of the extrajudicial statements, confessions or admissions of the defendant. (See, e.g., *People* v. *Mehaffey* (1948) 32 Cal.2d 535, 544-545 [197 P.2d 12]; *People* v. *Cantrell* (1973) 8 Cal.3d 672, 679-680 [105 Cal.Rptr. 792, 504 P.2d 1256].) "[I]t is likewise well settled [,however,] that . . . the prosecutor is not required to establish the corpus delicti by proof as clear and convincing as is necessary to establish the fact of guilt; rather slight or prima facie proof is sufficient for such purpose." (*People* v. *Mehaffey, supra*, 32 Cal.2d at p. 545.) As we explained in *People* v. *Jacobson* (1965) 63 Cal.2d 317, 327 [46 Cal. Rptr. 515, 405 P.2d 555]: "To meet the foundational test the prosecution need not eliminate all inferences tending to show a noncriminal cause of death. Rather, the foundation may be laid by the introduction of evidence *which creates a reasonable inference that the death could have been caused by a criminal agency [citation] even in the presence of an equally plausible noncriminal explanation of the event.* [Citations.]" (Italics added.) The authorities also make it clear that "[t]he corpus delicti may be established from circumstantial evidence, and by the reasonable inferences to be drawn from such evidence." (*People* v. *Cantrell, supra*, 8 Cal.3d at p. 679.)

In this case Towler contends that without his extrajudicial statements the evidence was insufficient to demonstrate that Stone's death was the result of a criminal agency. He emphasizes that all of the doctors who testified concluded that the death was probably not caused by either shooting, stabbing, strangulation or a blow to the head, the most common methods of homicide, and that because of the state of the body at the time of examination the doctors could not determine the actual cause of death. Towler argues that this medical evidence, particularly when considered with the testimony suggesting that Stone may have committed suicide or may have accidentally drowned while under the influence of PCP, does not support a determination that it is "reasonably probable" that the death was caused by the criminal act of another. (*People* v. *Cantrell, supra*, 8 Cal.3d at p. 679.)

Although the medical testimony was inconclusive, there was a considerable amount of additional evidence, exclusive of Towler's statements, from which it was reasonable to infer that Stone's death could have

been caused by a criminal agency. Stone was a police informant, living among associates who frequently sold and used illegal drugs. Stone's role as an informant was widely known or suspected by many of those around him and he evidently feared for his own safety, having told a fellow worker shortly before his disappearance that the police should be notified if he failed to show up for work.[4]

Stone disappeared suddenly without telling anyone where he was going. His body was found several miles outside of Sonora in a fairly remote area and since he had no motor vehicle it would be reasonable to infer that someone else had taken him to the river. He was found in the same clothes that he had recently acquired for his new position of assistant restaurant manager, clothes that he would not have been expected to be wearing if, for example, he had gone camping by the river. The wallet which he usually carried was not found with his body, suggesting that someone may have taken it before disposing of the body in or near the river.

While the condition of the body did not enable the doctors to determine the probable cause of death, the medical evidence did suggest that Stone probably died around the date of his initial, sudden disappearance. And although the doctors concluded that Stone probably had not been shot, stabbed, strangled or beaten, the decomposition of the body prevented them from determining whether he had died from a drug overdose or some other toxic agent. Given the availability of drugs in Stone's circle of "friends," such an overdose may not have been an implausible method for doing away with him.

Finally, there is evidence that when last seen, Stone was in the company of Towler, a person with whom he had recently had a fight and who had a motive to harm him.

---

[4]At several points in the proceedings, the trial court indicated that Stone's status as a drug informant influenced its conclusion that Stone had died by unnatural means. Towler argues that the court's suggestion that drug informants often die by criminal means was an unreasonable inference, unsupported by evidence, which impermissibly formed the basis both for the finding of corpus delicti and for his conviction.

Although the record does indicate that the trial court relied on Stone's status as a drug informant, it does not demonstrate that this was the sole basis for the trial court's determination. Moreover, contrary to defendant's contention, we think that the court could reasonably infer—without additional evidence—that by acting as a drug informant Stone placed himself in a dangerous position and was more likely than the ordinary person to become a homicide victim.

All of this evidence, of course, did not rule out the possibility that Stone had died from noncriminal causes. As noted, however, the corpus delicti rule is satisfied "by the introduction of evidence which creates a reasonable inference that death could have been caused by a criminal agency . . . even in the presence of an equally plausible noncriminal explanation of the event." (*People v. Jacobson, supra*, 63 Cal.2d at p. 327.) We conclude that the evidence is sufficient to support a reasonable inference that death could have been caused by a criminal agency.

### B.

Towler next contends that even if the evidence was sufficient to satisfy the corpus delicti rule's "prima facie" standard, the evidence taken as a whole—even including his extrajudicial statements—is not sufficient to satisfy the higher standard of proof necessary to sustain his conviction. Towler argues that in view of the inconclusiveness of the medical testimony and the absence of any proof as to the precise time, manner or cause of death, the trial court could not properly find him guilty of murder under the applicable reasonable doubt standard.

The recent cases of *Jackson v. Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781] and *People v. Johnson* (1980) 26 Cal.3d 557 [162 Cal.Rptr. 431, 606 P.2d 738], refine the standard of review which governs our consideration of the sufficiency of the evidence contention on this appeal. In *Jackson*, the United States Supreme Court held that "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . [is] to determine whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt." (443 U.S. at p. 318 [61 L.Ed.2d at p. 573].) The *Jackson* court went on to explain that "this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Id.* at pp. 318-319 [61 L.Ed.2d at p. 573].)

In *Johnson*, our court found California's traditional sufficiency of the evidence standard of review consistent with *Jackson*, emphasizing that in passing upon such a claim a "court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable,

credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (26 Cal.3d at p. 578.)

■ Focusing on the familiar jury instruction which indicates, in part, that to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other reasonable conclusion (see CALJIC No. 2.01 (1979 rev.);[5] *People v. Merkouris* (1956) 46 Cal.2d 540, 560 [297 P.2d 999]; *People v. Bender* (1945) 27 Cal.2d 164, 175 [163 P.2d 8]), Towler suggests that a stricter standard of appellate review applies in circumstantial evidence cases. As numerous decisions of our court explain, however, the circumstantial evidence rule on which defendant relies is "primarily for the guidance of the trier of fact." (See, e.g., *People v. Redrick* (1961) 55 Cal.2d 282, 289 [10 Cal.Rptr. 823, 359 P.2d 255]; *People v. Daugherty* (1953) 40 Cal.2d 876, 885-886 [256 P.2d 911]; *People v. Perkins* (1937) 8 Cal.2d 502, 518-519 [66 P.2d 631].) "The rule . . . does no more than to instruct the jury that if a reasonable doubt is created in their minds for any reason they must acquit the defendant. But where the jury rejects the hypothesis pointing to innocence by its verdict, and there is evidence to support the implied finding of guilt as the more reasonable of the two hypotheses, this court is bound by the finding of the jury." (*People v. Perkins, supra,* 8 Cal.2d at p. 519.) Thus, even though the appellate court may itself believe that the circumstantial evidence might be reasonably reconciled with the defendant's innocence, this alone does not warrant interference with the determination of the trier of fact. (See, e.g., *People v. Redrick, supra,* 55 Cal.2d at p. 290; *People v. Daugherty, supra,* 40 Cal.2d at pp. 885-886.) Whether the evidence presented at trial is direct or circumstantial, under *Jackson* and *Johnson* the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (See, e.g., *People v. Cordova* (1979) 97 Cal.App.3d 665, 669-670 [158 Cal.

---

[5]The current version of CALJIC No. 2.01 reads in relevant part: ". . . [A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion. [¶] . . . [¶] [I]f the circumstantial evidence is suceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt. [¶] If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

Rptr. 852]; *People* v. *Young* (1981) 120 Cal.App.3d 683, 693-694 [175 Cal.Rptr. 1].)[6]

 A review of the whole record in the light most favorable to the judgment reveals considerable evidence supporting the trial court's finding of guilt. In addition to the facts and inferences discussed with respect to the corpus delicti issue, the record evidence reasonably supports the following narrative.

In late 1977, Towler learned that Stone was an informant who was responsible for his arrest and conviction on drug charges. Even before being arrested, Towler had threatened Stone during a conversation with Robert Burns. ("I don't think he's gonna be living up here very much longer . . . Stone's likely to get his ass stomped pretty good because he's been talking a lot of shit about a lot of people . . . and I'm sorry to hear that he's a friend of yours, man, but I don't fuck around.") Towler had already stated that he thought "snitches" should be killed and in January 1978, when he was out on bail awaiting sentencing on the conviction on which he had been "set up," he expressed his intent to get even with Stone to several people, including Susan MacDonald ("Ron had snitched him off, and . . . he was going to pay back Ron Stone for doing so. . . ."), and Gayle Burkhart ("he thought it was right for Ron . . . to be killed . . . because nobody deserves to be busted.").

During this time period, Towler informed two people that there was a "plan" to "get" Stone: Steve Knooff ("he was going to get [Stone] . . . before he went to prison"); and Gayle Burkhart (". . . when he went to jail somebody was supposed . . . do something to Ron, get Ron . . ."). Significantly, he also told Burkhart, that when Stone's body was found it would look like an accident, "there would be no evidence . . . it would be so gone . . . that nobody would know how it was done."[7] On Friday, January 20, just before Stone's disappearance, Towler got into a fight with Stone during which he called him a "snitch" and told him he "was dead." Early the next morning, Stone—acting apparently out of fear of

---

[6]Indeed, in reiterating the prevailing California standard of review, our decision in *Johnson* drew specifically upon the statement of the test in *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649], a circumstantial evidence case. (See 26 Cal.3d at p. 576.)

[7]Although a number of witnesses testified that Burkhart's testimony was motivated by revenge, even if the trial court credited these witnesses, it might have concluded that her desire for revenge simply explained her willingness to testify against Towler, but did not indicate that she had lied about what Towler had told her.

Towler—went to breakfast with Towler and his friends, paid for the meal and left the restaurant alone.

That night, at a going-away party for Towler, Towler told Roland that he was angry at Stone and wanted to "kick his ass." Roland went directly from the party to the Happy Kup and asked Stone to accompany him for a drive when he left work at 4 a.m. Shortly thereafter, Schoeppner, Stone's roommate, saw Towler in Roland's car as Stone was about to enter the car.[8] Stone was never seen again and may well have died that morning.

From this evidence, the trial court could reasonably have found that Towler had the motive, intent and opportunity to kill Stone. Although the state of the body at the time of its discovery made it impossible to determine the actual cause of death, if the court credited Burkhart's testimony concerning Towler's plan to make Stone's death "look like an accident" it could reasonably have concluded that, through a drug overdose or some similar toxic agent not detectable because of the body's decomposition, Towler was responsible for Stone's death. Although other possible causes of death were not conclusively disproved, given the testimony concerning Towler's threats, the timing of Stone's disappearance, and the discovery of the body in a location to which Stone probably did not go by himself, the trial court could have rejected as unreasonable the suggested inference that Stone had committed suicide or that his death was accidental. In light of the whole record, we conclude that the evidence is sufficient to support the conviction.

### III

■ Towler next contends that his conviction should be reversed and the proceedings dismissed because of actions of the district attorney which allegedly interfered with his attorney-client relationship.

On August 24, 1978, before the start of trial, defense counsel informed the court that on the previous day the district attorney had entered Towler's jail cell without a warrant and without defense counsel's consent and had seized a number of documents belonging to

---

[8]Although Schoeppner subsequently recanted his positive identification of Towler, the later testimony was made under suspicious circumstances and could reasonably have been discounted by the court. In fact the court's remarks indicate that because of Schoeppner's about-face, it did not rely on his testimony.

Towler. Counsel stated that one of the documents was a "synopsis" of the defense which Towler had prepared at counsel's request, and he asked the court "either to hold the district attorney in contempt or to confiscate these documents pending a motion for suppression of that evidence."

In response, the district attorney explained that he entered the cell for the purpose of obtaining a handwriting exemplar of Towler. He conceded, however, that "when I saw that document, I was more interested in its contents than handwriting specimen." During the hearing, neither the district attorney nor defense counsel revealed the specific contents of the seized document.

The trial court ordered the district attorney to turn over the seized documents to the clerk of the court, but declined to hold him in contempt. Although at one point defense counsel stated that "I think the case should be stopped at this point," counsel never formally moved for a dismissal of the charges and at the conclusion of the hearing he specifically confirmed that "I'm not asking that the Court turn this defendant loose at this time."

Several weeks later, the district attorney moved for the return of the documents which had been confiscated. The court denied the motion, and the documents were apparently never introduced into evidence. Defense counsel made no motion before or during trial seeking either the dismissal of the proceedings or the suppression of any evidence as the fruit of the prosecutor's alleged misconduct. The documents in question are not contained in the record on appeal.

Relying on *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818], defendant now contends that the prosecutor's conduct calls for the dismissal of the criminal proceedings against him. Unlike in *Barber*, however, here defendant never sought dismissal in the trial court, but after discovering the district attorney's actions simply requested that the court confiscate the documents "pending a motion to suppress the evidence." The trial court granted that relief in full. (See *People* v. *Holzer* (1972) 25 Cal.App.3d 456, 463 [102 Cal.Rptr. 11].)

Defendant maintains that because the trial in this case took place before the opinion in *Barber* was filed, his counsel should not be expected to have anticipated that decision's holding that dismissal is an available

sanction for such an intrusion. (Cf. *People* v. *De Santiago* (1969) 71 Cal.2d 18, 22-28 [76 Cal.Rptr. 809, 453 P.2d 353].) Although dismissal was not an established sanction before *Barber*, the defendants in *Barber* itself did, of course, seek such a dismissal in the trial court before trial and pursued that issue to this court by a pretrial writ. If Towler believed that the district attorney's conduct had undermined or prejudiced his defense, he did not need *Barber* to suggest that a motion for dismissal was the logical move.

Furthermore, at the time of the trial, the existing California and federal authorities held that if the prosecution had improperly obtained confidential information by intruding on the attorney-client relationship, the defendant could obtain a ruling requiring "the People . . . [to] demonstrate to the satisfaction of the trial court, beyond a reasonable doubt [citation], that the evidence they seek to adduce derives in no way from the [intrusion]." (*Wilson* v. *Superior Court* (1977) 70 Cal. App.3d 751, 760 [139 Cal.Rptr. 61]; see *Hoffa* v. *United States* (1966) 385 U.S. 293, 307-308 [17 L.Ed.2d 374, 384-386, 87 S.Ct. 408]; *Black* v. *United States* (1966) 385 U.S. 26, 28-29 [17 L.Ed.2d 26, 28-29, 87 S.Ct. 190].) Defendant never sought such a ruling, perhaps recognizing that none of the prosecution's evidence did in fact derive from the district attorney's misconduct. Since defendant failed to seek the relief that *was* available under the pre-*Barber* authorities, he cannot escape the waiver problem simply because *Barber* approved a more severe sanction.

Finally, the record before us is totally inadequate to determine whether or not dismissal would be an appropriate sanction. On the facts of *Barber*, we concluded that an exclusionary sanction would not adequately protect the defendants' rights, in part because in order to enforce that sanction the defendants would have been forced to divulge the full contents of conversations to which the police informant, but not the prosecutor, had been privy. (24 Cal.3d at p. 758.) Here, however, defendant would not have had to provide any information that the prosecutor did not already know because the confidential information was contained in a written document that the prosecutor had seized. Moreover, unlike the situation in *Barber*, here it might have been readily apparent from an examination of the document whether or not the prosecution was actually aided by the information and whether some remedy short of dismissal would be adequate to protect defendant's rights. (Cf. *People* v. *Zamora* (1980) 28 Cal.3d 88, 99-103 [167 Cal.Rptr. 573, 615 P.2d 1361].) Since the inadequacy of the record is

attributable to defendant's failure to pursue this matter below, we conclude that defendant may not raise this claim for the first time on appeal. (See, e.g., *People v. Holzer, supra,* 25 Cal.App.3d 456; accord *Coy v. Superior Court* (1959) 51 Cal.2d 471, 473 [334 P.2d 569].)

IV

Finally, Towler seeks reversal of his conviction on the basis of a number of alleged irregularities in the grand jury proceedings which resulted in his indictment.[9] In *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941], we recently held that a showing of actual prejudice is necessary to justify reversal when irregularities in a preliminary examination are challenged after trial on appeal of a conviction. The reasoning of *Pompa-Ortiz* applies with equal force in the grand jury context. Because Towler fails to demonstrate that the alleged errors before the grand jury deprived him of a fair trial or otherwise resulted in any actual prejudice relating to his conviction, reversal is not warranted.

Affirmed.

Bird, C. J., Mosk, J., Richardson, J., Newman, J., and Broussard, J., concurred.

Appellant's petition for a rehearing was denied May 12, 1982.

---

[9]Towler complains primarily of (1) the introduction of a number of allegedly inadmissible hearsay statements before the grand jury and (2) the prosecutor's allegedly improper comments to the grand jury concerning his and Roland's exercise of their *Miranda* rights. Although he acknowledges that there was sufficient admissible evidence before the grand jury to support the indictment, he claims that the extent of the inadmissible evidence presented was so great that "it is unreasonable to expect that the grand jury could limit its consideration to the admissible, relevant evidence," thereby denying him due process. (See *People v. Backus* (1979) 23 Cal.3d 360, 393 [152 Cal.Rptr. 710, 590 P.2d 837].)