[No. A048340. First Dist., Div. Two. Aug. 8, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL GUITERREZ, Defendant and Appellant.

---

**COUNSEL**

Paul Delano Wolf, under appointment by the Court of Appeal, Susan Raffanti and Jeffrey S. Kross for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Aileen Bunney, Deputy Attorney General, for Plaintiff and Respondent.

---

**OPINION**

**KLINE, P. J.**—Appellant Daniel Guiterrez appeals following jury trial where he was convicted on five counts of violating Penal Code sections 261, subdivision (2), and 264.1 (rape by force while acting in concert with others). He asserts the court erred (1) by refusing to instruct on the offense of battery; (2) by denying his motion for judgment of acquittal and for a new trial based on the insufficiency of the evidence; (3) in declaring a proposed prosecution witness unavailable, and thus permitting his preliminary hearing testimony to be received as evidence; and (4) by refusing to instruct the jury on the statute of limitations. We shall affirm.

### STATEMENT OF THE FACTS

Carol J., the victim in this case, testified that on March 25, 1983, she and some friends went to a club, had some drinks and danced until approximately 2 a.m. After that time she returned to her Union City condominium, where she and her boyfriend had an argument. Ms. J. testified that she needed some time alone, and decided to walk to the 7-Eleven store to buy food for breakfast. She walked toward the store and sat down on the curb across from the store. She noticed a van drive by and then return a few minutes later. The van stopped next to her, the door opened and some men in the rear of the van began talking to her. The men asked if Ms. J. wanted a ride to the store, but she declined and began walking. Two men came up beside her, grabbed her arms and told her to get into the van.

When Ms. J. entered the van she saw four men in the back, one in the driver's seat and one in the front passenger seat. The van started moving and was travelling away from the 7-Eleven store. The men began smoking marijuana; Ms. J. did not smoke any. After a few minutes the van stopped near a 7-Eleven store, but it was not the one Ms. J. wanted to go to. When she tried to get out of the van she was thrown to the floor.

The van started moving and Ms. J. felt hands touching her breasts and ripping at her clothes. She testified that she was very frightened and was kicking, biting and cursing at her assailants. After a time, she told the men if they left her alone she would remove her clothes; she explained she thought she wouldn't get hurt as much that way. Crying, she removed her clothes and her bra which had been torn by the men.

Ms. J. asked the men how they would like it if someone did this to their girlfriends or mothers and someone punched her in the sternum with his fist. One of the men began to lie on top of her and she kicked him; after that point the men held her legs down. Ms. J. testified that she felt hands on her breasts and fingers inside her vagina and anus. One of the men then got on top of her and had intercourse with her while four of the others held her arms and legs. After that man was finished, another man got on top of her and had intercourse with her. At that point Ms. J. recalled that four men were holding her limbs and her head was resting in someone's lap.

Some of the men told her to fondle their penises, but when she did so too roughly they told her to stop. Someone told her to suck his penis but she warned him if he placed his penis in her mouth she would "bite it off." The men then lifted her hips off the floor of the van, and told her they were going to sodomize her, but in fact did not. A third person then lay on top of Ms. J. and had intercourse with her. Ms. J. was crying and asked if "it was over yet." The man holding her head told her to relax and that it would end soon. A fourth man then got on top of her and had intercourse with her. Finally, a man lay on top of her and whispered that he was only going to fake intercourse with her because his friends were urging him to have sex with her. In all, Ms. J. recalled five separate acts of intercourse, but could not definitively indicate the sequence of the attacks.

After a time the men gave Ms. J. her clothes so she could dress. She testified that she attempted to dress, although she was not given her panties and her jumpsuit had been ripped open. The men let Ms. J. out and warned her not to look at the van or they would kill her. As the van pulled away she noticed it bore a bumper sticker that said "Argus" newspaper.

Ms. J. stated that the men conversed with one another in Spanish but spoke to her in English. Because it was dark out and the van was not

illuminated Ms. J. was unable to identify any of the assailants. However, she testified that one of the men—the one who punched her in the chest—was wearing a white shirt. According to Ms. J., none of the men smelled of alcohol.

Ms. J. was left off about five miles from her home. She walked until she saw some cars passing by; two men stopped and offered to help her. At first she ran, but was persuaded to accompany them to a nearby restaurant where two police officers were eating. The officers took her to the Union City Police Department and later to a hospital, where she was examined using a sexual assault kit. Several days later the police asked her to try to identify the van and she positively identified a vehicle as the van in which she was raped.

Union City Police Officer Rich Noack testified that on March 26, 1983, at approximately 4 a.m. he was taking his lunch break at a Carrows restaurant. A man approached to say he had found a woman who had been assaulted. When the officer went out to the parking lot he found Ms. J., whom he knew from the time she worked a waitress at a local restaurant. He and another officer, Officer Reese, took Ms. J. to the police station, and then to the hospital.

At approximately midnight on March 28 Officer Noack was notified that another officer had spotted a van that fit the description provided by Ms. J. He went to look at the van, and spoke to the driver, Luis Ortiz, who gave permission for his van to be inspected. Ms. J. was summoned to the van; after viewing the van she identified it as the vehicle in which she was raped. Luis Ortiz was placed under arrest and taken to the police station. Officer Noack later took Ortiz to the area where the rape occurred to look for Ms. J.'s lost underwear. The underwear was found near that site.

Sergeant Shelton of the Union City Police Department testified he spoke to Luis Ortiz on March 28 while he was being held at the station. Ortiz gave the officer written permission to search the van and the room he used in his father's home. When Sergeant Shelton went to the Ortiz home Luis's father also consented to the search.

The sergeant discovered Luis's brother, Victor, sleeping in the bedroom. Victor awoke and was questioned about Luis's whereabouts on the night of March 26. Victor stated that he, Luis, a friend Jaime and another man, whom he knew only as "Mike," had been to a carnival on the 26th. After the carnival, they drove to Oakland, then to Fremont, where they danced at La Fuentes restaurant until it closed. He explained that Jaime and Mike were

then dropped off and he and Luis returned home and went to sleep. According to Victor, he and Luis did not drink that evening.

Luis's father and sister, Norma, went to the police station so they would be present while Luis (who was a minor) was questioned. Luis told the sergeant that on March 26 he and Victor first went to visit a friend. When the friend was not home, they went to a restaurant in Fremont. Because they were under age they were not allowed into the restaurant, but waited outside until after midnight, hoping to speak to some girls. They then went home and went to sleep. Luis claimed he and Victor were alone in the van and did not pick up any friends that evening.

Sergeant Shelton left for a moment, then returned and told Luis he did not believe his story because it conflicted with Victor's report. After Luis's sister urged him to tell the truth he changed his story. He reported that on the evening of the rapes, he, Victor, appellant and "Mike" went to a carnival and left at approximately 10:30 p.m. to visit appellant's girlfriend. When she was not home they picked up another friend, Larry, and went to the La Fuentes restaurant, where he and Jaime had to wait outside.

After the restaurant closed they went to a convenience store and soon noticed a girl on the side of the road. According to Luis, Jaime asked the girl if she wanted a ride and she voluntarily got into the van. He stated that appellant was asleep in the front passenger seat and did not awake until they reached their destination in the Seven Hills area of Union City. Mike then asked the girl if she wished to have intercourse and she did not resist. After Mike was done, Jaime also had intercourse with her. Appellant then moved toward the woman and she started yelling and kicking. Appellant slapped her across her face and had intercourse with her. Luis admitted that although he knew it was a "bad thing," he nonetheless had intercourse with the woman because she was not resisting. Luis told Sergeant Shelton that Larry did not participate in the crime and did not hold or touch the victim. After the assault ended they let the woman out of the van and threw her panties out the window. After Luis completed this statement he wrote his version of the events.

At trial, Luis gave a different version of the events of that evening. Luis testified that he spent March 25, 1983, with appellant, Michael Corjasso, Larry Gonzalez, Jaime Infante and his brother, Victor. They drank some beer and then went dancing at La Fuentes restaurant until approximately 1:30 a.m. When they left the restaurant appellant was sitting in the front passenger seat as they drove toward home. Luis spotted a woman sitting on the curb and asked her if she wanted a ride. Although she first declined, she changed her mind and voluntarily got into the van. At her request, Luis

drove her to a 7-Eleven; however, when they arrived she said it was the wrong one. Luis began driving again and the woman said she wanted to get out. Luis continued driving toward the Seven Hills area. Appellant was passed out in the front seat at this time.

When he stopped the van he looked back and saw one of the men (he believed it was Mike) on top of the woman. Jaime got on top of the woman after Mike, then Luis did the same. He asserted he did not rape the woman, but only got on top of her because his friends were urging him to do so. Appellant remained asleep in the passenger seat during the first part of the attack, but eventually awakened and approached the woman. She kicked appellant, and Luis and Victor told him, "That's enough." He did not see appellant or anyone else hit the victim. Luis testified that Larry did not participate in the attack and did not hold or touch the victim.

Luis's brother, Victor Ortiz, also testified that he, Luis, appellant, Mike, Jaime and Larry went to La Fuentes on the night of the attack. After they picked up a woman, they drove to a 7-Eleven. The woman said she wanted to get out of the van, but the van drove toward Seven Hills. Victor saw someone touch the woman, but could not identify who because it was too dark. He saw someone pull the woman's clothes off, and heard her pleading for him not do that. He saw the woman lying naked on the floor of the van and one of the men appeared to have intercourse with her. Several of the men were grabbing at her and touching her. Eventually the woman slid back toward the rear of the van and her head was touching Victor's knees. He told her to relax and they wouldn't hurt her. Victor saw another man get on to the woman but, because it was so dark in the van, could not identify him. In all, Victor recalled that at least three men had sex with the woman, but could not say if there were more. He was the last of the men to lie on Ms. J., but did not have intercourse with her. Victor first testified that he did not see appellant leave the front passenger seat, but later stated that when appellant was alone in the front of the van he saw a "shadow" emerge from the front and stumble onto Ms. J. That person then got on top of Ms. J. Victor also testified that the van was so dark he could not identify any of the men.

When confronted with his preliminary hearing testimony Victor admitted he previously testified that "just about everybody" got on top of Ms. J. He also acknowledged that when he was first questioned by the police he told them that either appellant or Jaime was the first to have intercourse with her. Victor testified that he had pled guilty to rape arising out of this incident.

Michael Corjasso, who was then serving a prison term at Santa Rita jail, also testified for the prosecution. Michael testified that he and his friends

picked up Ms. J. and offered to give her a ride to the store. When they stopped at the wrong store Ms. J. tried to get out of the van and was stopped by Larry or Jaime. Victor and Jaime then began tearing at Ms. J.'s clothes. According to Michael's testimony, the van stopped in an area where homes were being built; the street lights already had been installed and provided some light. Appellant, who had been sleeping in the front, woke up and began having sex with Ms. J. Michael asserted that, at his friends' urging, he got on top of Ms. J., but only faked an act of intercourse. He whispered to Ms. J. he was sorry for the attack and explained that he did not expect this to happen. After he was done appellant again had intercourse with Ms. J. Michael recalled that appellant hit her and told her to "shut up." He then placed his penis near Ms. J.'s face and told her to suck it; she warned him she would bite it off. Michael testified that Jaime, Luis and Victor then had intercourse with Ms. J. Michael's testimony at trial was partially inconsistent with his testimony at Victor's preliminary hearing, where he stated that he went to the front of the van after he was on top of Ms. J. and did not look into the back of the van after that point.

Michael testified that several days after the attack Victor warned him the police had been asking about their activities on the night of the attack. After the police spoke to Michael's parents about the incident, he turned himself in to the police. Michael spent some time in juvenile hall; the charges against him ultimately were dismissed in exchange for his testimony at Victor's trial.

After the court determined Jaime Infante was unavailable as a witness Inspector Crisolo from the district attorney's office was permitted to read into evidence the testimony Jaime gave at appellant's preliminary hearing. Jaime stated that on the night of the attack he, Victor, Luis, Mike, Larry and appellant went to La Fuentes and later picked up a woman. Mike began talking to the woman and soon was helping take off her clothes. Mike began kissing the woman and having sex with her. Jaime testified that "somebody else"—he believed it was Victor or Luis—then became involved and had sex with her. According to Jaime, the woman was not yelling or resisting at this time. He saw appellant get on top of Ms. J., but could not say if he actually had intercourse with her. Jaime testified that he crawled on top of the woman but decided not to have intercourse with her.

Appellant testified that during March 1983 he was living in a residential drug rehabilitation center in Oakland. On the day of this incident he was given a 24-hour pass and left on the morning of March 25. After he determined his girlfriend was not at home he purchased some whiskey at approximately noon and consumed the entire bottle within an hour. He also drank some wine with others in a nearby park. Appellant remembered being

at a fair but could not recall what he did at the fair or how he left. He also could not recall being in Luis's van, could not remember Ms. J. being there and could not recall any of the events that took place in the van. He awoke at the Ortiz home and Victor and Luis told him what had happened. They told appellant he passed out in the van and did not do anything with Ms. J.

Several days later he learned the Ortizes were being held for rape. Appellant was scared, because he was present at the rape but expected no one would believe he had not participated. He left the drug program and took a bus to San Diego. He stayed in San Diego and regularly visited Mexico on the weekends. At one point he lived in Mexico for approximately four months and, when he was arrested, he gave a Tijuana address.

On December 3, 1988, appellant was stopped by United States Customs Agent Hermelinda Hansen as he crossed from Mexico to San Ysidro, California. Appellant was thereafter arrested by a San Diego police officer.

Sharon Ann Binkley, a criminalist for the Alameda County Sheriff's Department Crime Laboratory, testified regarding tests she performed on certain evidence and clothing relating to this case. Ms. Binkley testified that Ms. J.'s bra was torn and the left cup was separated from the center of the bra. Two of the clasps were also torn off the back of the bra. Three of the buttons on the jumpsuit had been torn off and the inseam running down both legs had been ripped apart. Semen stains were found on both the crotch and the shoulder of the jumpsuit, and on Ms. J.'s jacket. Ms. Binkley also tested four cigarette butts recovered by the police, which tested positive for the presence of saliva.

Ms. J. had an ABO type O and was a secretor. Tests on the vaginal swab, the stains on the jumpsuit and the cigarettes revealed type B and type H blood group substances. Ms. J. could not have provided the B type substances; appellant had type B blood and was a secretor. As a B-type secretor, appellant's bodily fluids would contain type B and type H substances.

Gary Sims, a criminalist employed by the defense, testified that he performed certain tests, including electrophoresis tests, on evidence relating to the assault. He determined that appellant was a type B secretor and Ms. J. was type O. The vaginal swab revealed both type B and type H activity; although the type H could have come from Ms. J., the type B could not. Mr. Sims also testified that the vaginal swab and the cloth from the crotch and shoulder of the jumpsuit showed only PGM subtype 1 plus, which was consistent with the victim's type, but not appellant's. However, on cross-examination Mr. Simms noted that seminal types are often not found

in vaginal samples because PGM from semen deteriorates rapidly in the vagina.

## STATEMENT OF THE CASE

An information[1] filed on April 26, 1989, in Alameda County Superior Court charged appellant Daniel Guiterrez with rape in concert (Pen. Code, §§ 261, 264.1, counts 1, 4, 6, 7, 9) and sodomy with a foreign object (Pen. Code, § 289, counts 2, 3, 5, 8, 10). The information further alleged the offenses were violent sex offenses and that appellant was ineligible for probation (Pen. Code, §§ 667.6, subd. (c), 1203.065, subd. (a)).

In May 1989, appellant filed a motion to dismiss the information, alleging that the statute of limitations had expired and that his right to a speedy trial had been violated. The court denied the motion on July 26, 1989.

On October 10, 1989, trial by jury commenced. On November 17, 1989, the jury found appellant guilty of rape and found the in concert clause to be true. The jury found appellant not guilty of sodomy with a foreign object.

On December 1, 1989, appellant filed a motion for a new trial (Pen. Code, § 1181) and a motion in arrest of judgment. On December 15, 1989, the court denied both motions.

On December 15, 1989, the court sentenced appellant to prison for a total term of 14 years, 2 months as follows: count 1, 7 years; count 4, 5 years (to run consecutively to count 1); count 6, 7 years (58 months stayed) for a total of 26 months (to run concurrently to count 1); count 7, 7 years (58 months stayed) for a total of 26 months (to run concurrently to count 1); count 9, 7 years (58 months stayed) for a total of 26 months (to run consecutively to count 1).

This timely appeal followed.

## DISCUSSION

### I.

Appellant argues the court erroneously refused his request for a jury instruction on the lesser offense of battery. (Pen. Code, § 242.) He suggests

---

[1]The district attorney filed four amended complaints in this case, three in 1983 and the fourth on April 5, 1989. The fourth complaint alleged appellant was out of the state from April 1, 1983, until December 3, 1988 (Pen. Code, § 803, subd. (d) [statute of limitations tolled for periods defendant is out of state]).

the jurors may have convicted him of rape because they believed he did *something*, but had no option of conviction on a lesser offense. He thus argues the jury was presented with an "unwarranted all-or-nothing choice" that resulted in his rape convictions. (See *People* v. *Wickersham* (1982) 32 Cal.3d 307, 324 [185 Cal.Rptr. 436, 650 P.2d 311].)

■ " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present, but not when there is no evidence that the offense was less than that charged." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], citations omitted.) ■ Battery, which is defined as "any willful and unlawful use of force or violence upon the person of another," (Pen. Code, § 242) is a lesser included offense of rape by means of force or fear. (*People* v. *Lema* (1987) 188 Cal.App.3d 1541, 1545 [234 Cal.Rptr. 173].)[2]

■ In this case we need not determine whether the evidence supported the giving of a battery instruction because, as appellant acknowledges, the only basis for a battery conviction was provided by the uncorroborated testimony of his accomplices.[3] Penal Code section 1111 provides in pertinent part that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

In *People* v. *Wallin* (1948) 32 Cal.2d 803, 808 [197 P.2d 734], our Supreme Court explained that "[t]he statutory requirement of corroboration

---

[2] " 'The test in this state of a necessarily included offense is simply that where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense.' " (*People* v. *West* (1970) 3 Cal.3d 595, 612 [91 Cal.Rptr. 385, 477 P.2d 409], quoting *People* v. *Greer* (1947) 30 Cal.2d 589, 596 [184 P.2d 512].) It is apparent that an act of rape under Penal Code section 261, subdivision (2), i.e., sexual intercourse accomplished against a person's will by means of force or violence, necessarily encompasses an act of battery.

[3] Appellant maintains the jury might have convicted him of a battery, rather than rape, based on Victor's testimony that appellant approached Ms. J. and drunkenly stumbled onto her for a brief period before returning to the front of the van. Luis also testified that when appellant approached the victim she struggled violently and he and Victor pushed appellant back into his seat.

is based primarily on the fact that experience has shown that the evidence of an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope of leniency or immunity." (Accord *In re Miguel L.* (1982) 32 Cal.3d 100, 108 [185 Cal.Rptr. 120, 649 P.2d 703] [accomplice testimony is "likely to have been influenced by the self-serving motives of the witness"]; *People* v. *Belton* (1979) 23 Cal.3d 516, 526 [153 Cal.Rptr. 195, 591 P.2d 485].) In this case it appears that Luis and Victor were not trying to protect themselves at appellant's expense: in fact, their testimony benefitted appellant in that they both asserted appellant slept through part of the attack and then had only the briefest contact with the victim. Thus, the rationale for the rule would seem inapplicable with regard to Victor's and Luis's testimony as their testimony relates to the rape charges since (1) they clearly did not attempt to shift the blame to appellant; and (2) there was no evidence they had reason to expect leniency in exchange for their testimony.[4]

Nonetheless, the instruction that the uncorroborated testimony of an accomplice is insufficient to support a conviction (CALJIC No. 3.11) was necessary, for example, to prevent the jury from convicting appellant of rape based solely on the uncorroborated testimony of Michael Corjasso, who provided perhaps the most incriminating testimony at trial. Appellant did not ask the court to limit the corroboration requirement to apply only to the *incriminating* (and not the exculpatory) accomplice testimony, and the court clearly had no sua sponte duty to do so.

Because appellant did not seek a limiting instruction, we have no occasion to consider whether it would have been proper to give one.[5] Suffice it to say that the jury in this case was properly instructed that it could not convict appellant based on the uncorroborated testimony of an accomplice. That rule *absolutely precludes appellant's conviction of battery*, which would be premised only on accomplice testimony without independant corroboration.[6] Under these circumstances, appellant was not entitled to an instruction on the lesser included offense of battery.

[4]Wigmore suggests that where the rationale is absent it makes no sense to require that the accomplice's testimony be viewed with distrust: "[t]he essential element, however, it must be remembered, is this supposed promise or expectation of conditional clemency. If that is lacking, the whole basis of distrust fails." (7 Wigmore on Evidence (Chadbourne Rev.) § 2057, at p. 417.) The record is silent on the question of whether Victor or Luis was induced to testify based on promises of leniency.

[5]We note, however, that there might be some practical problems with instructing the jury to apply the corroboration rule only to those portions of the accomplice testimony that are unfavorable to the defendant, and to ignore the rule when considering accomplice testimony that tends to exculpate the defendant.

[6]While the corroborating evidence need not be sufficient in itself to establish every element of the crime, " ' "it must tend to implicate the defendant and therefore must relate to some act

## II.

After the prosecution's case appellant moved, under Penal Code section 1118.1,[7] for a judgment of acquittal on the ground the evidence was insufficient to sustain the rape allegations. The motion was denied. On the date set for sentencing appellant moved for a new trial or a modification of the verdict on the same basis.[8] That motion also was denied.

■ Appellant contends the court erred in denying these motions because the evidence was insufficient to support five guilty verdicts of rape in concert. Appellant argues the evidence fails to establish his involvement in the first two rapes because Luis, Victor and Jaime all testified he remained asleep in the front passenger seat during those rapes. Appellant acknowledges Michael testified appellant awoke when the van stopped and immediately went to the back of the van to rape Ms. J.; appellant maintains, however, that because Michael's testimony was uncorroborated by nonaccomplice testimony, it cannot be used to support the verdicts. (See CALJIC Nos. 3.12 and 3.13.)

■ "The test to be applied by a trial court in deciding a section 1118.1 motion is the "'same test applied by an appellate court in reviewing a conviction: whether from the evidence, including reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged."'" (*People v. Veitch* (1982) 128 Cal.App.3d 460, 466 [180 Cal.Rptr. 412], quoting *People v. Lines* (1975) 13 Cal.3d 500,

or fact which is an element of the crime . . . ."'" (*People v. Hathcock* (1973) 8 Cal.3d 599, 617 [105 Cal.Rptr. 540, 504 P.2d 476].) In this case, there was clearly no evidence to corroborate the portion of Luis and Victor's testimony that might have supported a battery charge. The victim was unable to identify any of the assailants, and thus did not implicate appellant. The physical evidence was consistent with appellant being one of the rapists, but had no bearing on his potential culpability on a charge of battery. Finally, while appellant admitted he was present at the rapes (albeit asleep), mere presence alone is insufficient to provide corroboration necessary for conviction. (*People v. Wood* (1961) 192 Cal.App.2d 393, 396 [13 Cal.Rptr. 339].)

[7]Penal Code section 1118.1 provides, in relevant part, "[i]n a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

[8]Under Penal Code section 1181, "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: . . . 6. When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed."

505 [119 Cal.Rptr. 225, 531 P.2d 793]; accord *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1022 [248 Cal.Rptr. 568, 755 P.2d 1017].) ■ On appeal from the denial of such a motion "the appellate court must assume in favor of the judgment every fact from which the jury could have reasonably deduced from the evidence that the offense was committed by the defendant. . . . The test on appeal is not whether the appellate court believes the evidence at trial established the defendant's guilt beyond a reasonable doubt, but whether ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People* v. *Rice* (1988) 200 Cal.App.3d 647, 651 [246 Cal.Rptr. 177], quoting *People* v. *Towler* (1982) 31 Cal.3d 105, 117 [181 Cal.Rptr. 391, 641 P.2d 1253], italics in original.)

■ After reviewing the record we have concluded the court was correct in denying appellant's motion for a judgment of acquittal. Although the evidence concerning appellant's level of participation was in conflict, Michael Corjasso's testimony implicated appellant as an active participant in all the rapes. Appellant is mistaken in his assertion that this testimony was uncorroborated with respect to the first two rapes: the victim explicitly testified that during those rapes five men restrained her while the remaining assailant was on top of her. This testimony directly contradicted appellant's claim that he slept through the first two rapes.

Appellant also suggests the testimony failed to provide substantial evidence he committed some affirmative act that would permit his conviction of five rapes in concert under Penal Code section 264.1. He is again mistaken. In *People* v. *Jones* (1989) 212 Cal.App.3d 966 [260 Cal.Rptr. 853], two men entered their victim's home and took turns raping her. On appeal Jones argued he could not be found guilty of rape "in concert" with another because the other man merely stood by and did not actively assist in the rape. (212 Cal.App.3d at p. 968.) We rejected that claim, and concluded, "[i]f both defendants 'acting together' each rape the victim, the 'in concert' clause has been satisfied, and there is no need to inquire whether one aided or abetted the other." (*Id.*, at p. 969.)

The evidence that the men in this case acted in concert is far stronger than in *Jones*, where the "passive" assailant merely stood guard while his partner committed the rape. Here, the victim testified that four of the men held her arms and legs, and one held her head while the sixth raped her. Two of the men testified they were very reluctant to participate, but finally faked an act of intercourse because the others were actively urging them to rape the victim. As we noted in *Jones*, the in concert statute was designed to discourage precisely this kind "gang type" assault. In sum, because the

record provides sufficient evidence to support the five convictions of rape in concert the court properly denied the motion for judgment of acquittal. For the same reasons, the court correctly denied the motion for new trial.

### III.

██ Under California law, prior testimony may be introduced if, among other things, the declarant is unavailable as a witness. (Evid. Code, § 1291.) "Unavailablity may be established by showing that the declarant is 'Absent from the hearing and the proponent of his statement has exercised reasonable diligence but has been unable to procure his attendance by the court's process.' " (*People* v. *Jackson* (1980) 28 Cal.3d 264, 311-312 [168 Cal.Rptr. 603, 618 P.2d 149], quoting Evid. Code, § 240, subd. (a)(5).)

██ Before Jaime Infante's preliminary hearing testimony was read into evidence the court considered the adequacy of the prosecution's efforts to secure Jaime's presence at trial. Jim Crisolo, an investigator for the Alameda County District Attorney's office, testified he called Infante's parents' home and spoke to someone who identified herself as Jaime's mother. She reported that Jaime occasionally came by the family home to pick up his mail. Mr. Crisolo then went to the home and left a subpoena in the door. He returned the following week; when no one was home he left a second subpoena in the door.

After that point he phoned the house almost daily and spoke to Jaime's family; they reported Jaime was staying with a girlfriend, and they did not have an address or phone number where he could be reached. Jaime's father told Mr. Crisolo he believed Jaime had received one of the subpoenas, but could not be sure. Records of the Department of Motor Vehicles confirmed Jaime Infante's last known address was the family home where the subpoenas had been left. Another investigator testified he called local hospitals, the jails and the morgue and did not find Infante. The court also was informed that Infante had failed to appear in Hayward Municipal Court and that a bench warrant had been issued. The court file in the Hayward matter, which also listed the family home as his residence, revealed that Infante had violated probation. Based on all this evidence, the court concluded the prosecution had made reasonable efforts to locate Infante who, in light of the outstanding warrant, would have a strong motive to avoid appearing in court.

Appellant complains the prosecution's investigation was inadequate. We disagree. In *People* v. *Jackson, supra,* the prosecution attempted to find a witness using methods similar to those employed here. There, the prosecution checked with family, local hospitals and jails, as the prosecution did in

this case. On appeal, our Supreme Court affirmed the trial court's finding that diligent efforts had made to locate the witness. ▇ The court explained, "due diligence is a factual question to be determined by the trial court according to the circumstances in each case; under familiar rules the trial court's ruling will not be disturbed unless an abuse of discretion appears." (*People* v. *Jackson, supra,* 28 Cal.3d at p. 312; *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73];[9] *People* v. *Hovey* (1988) 44 Cal.3d 543, 563 [244 Cal.Rptr. 121, 749 P.2d 776].) ▇ Although appellant suggests the prosecution might have pursued others lines of inquiry (such as jobs, schools or voter registration records), the prosecution need not exhaust every potential avenue of investigation to satisfy its obligation to use due diligence to secure the witness.[10] (See *People* v. *Salas* (1976) 58 Cal.App.3d 460, 471 [129 Cal.Rptr. 871].) We find no abuse of discretion on this record; the court thus properly permitted Jaime Infante's preliminary hearing testimony to be read to the jury.

## IV.

▇ By information filed April 26, 1989, appellant was charged with five counts of rape in concert and five counts of anal penetration on or about March 26, 1983. At trial defense counsel requested the court to instruct the jury that the prosecution bears the burden of proving the prosecution was commenced within six years as provided by the relevant statute of limitations.[11] The court denied the request and appellant now assigns this as error.

Penal Code section 804, subdivision (d) provides, in relevant part, that "prosecution for an offense is commenced when any of the following occurs: . . . (d) An arrest warrant or bench warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity

---

[9]Appellant suggests this case is like *Enriquez, supra,* where the court concluded the prosecution exercised "casual indifference, not diligence" in attempting to locate a witness. (19 Cal.3d at p. 236.) *Enriquez* is distinguishable because the prosecution in that case made no effort to serve a warrant on the missing witness, despite the fact that he was a minor, who might be expected to stop at his mother's home. (*Ibid.*) Here, the prosecution left two subpoenas for Infante at his parents' home, repeatedly called and visited the home, and inquired at jails, hospitals and the Department of Motor Vehicles in an effort to locate this witness.

[10]Appellant does not suggest that any such additional investigation would have been successful. In fact, some of his proposed sources of information were unlikely to yield any helpful news. For example, appellant complains that although Infante was on probation, his probation officer was not contacted. Since there was an outstanding warrant for Infante for violating his probation we can assume the probation department would have arranged for Infante's arrest if it had any more accurate information on his whereabouts.

[11]Penal Code section 800 provides that prosecution for an offense punishable by imprisonment in state prison for eight years of more (which includes the crime of rape in concert) must be commenced within six years from the commission of the crime.

required for an indictment, information, or complaint." Sergeant Randy Ulibarri of the Union City Police Department testified he secured a warrant for appellant's arrest shortly after the rapes were committed. When the prosecutor sought to admit into evidence a certified copy of the arrest warrant naming appellant, the court concluded the document added nothing to the case, since defense counsel agreed there was no dispute that such a warrant had been issued. Under these circumstances, any error in failing to prove compliance with the statute is surely harmless.

In *People* v. *Lewis* (1986) 180 Cal.App.3d 816 [225 Cal.Rptr. 782] the prosecution failed to plead and prove it had timely commenced the action against the defendant. On appeal, the court determined the error was not prejudicial because "the issuance of a valid warrant for appellant's arrest shortly after the commission of the crime is an undisputed fact and the issuance of the arrest warrant tolled the limitations period as a matter of law. The existence of an event tolling the period being an undisputed fact, the error in failing to plead that event or to prove it to the jury is harmless." (*Id.*, at p. 821; *People* v. *Posten* (1980) 108 Cal.App.3d 633, 648-649 [166 Cal.Rptr. 661] [jurisdictional defects do not require reversal where those defects are as a matter of law cured on the record].) By the same reasoning, because the defense did not dispute the existence of an arrest warrant for appellant in the instant case, any error in failing to prove this fact to show compliance with the statute of limitations could not have been prejudicial.[12]

### DISPOSITION

The judgment is affirmed.

Smith, J., and Benson, J., concurred.

---

[12]In addition, appellant admitted he lived in Mexico for four months during the six-year limitations period. Because the statute is tolled during periods the defendant is out of state (Pen. Code, § 803, subd. (d)), and the information was filed only one month after the limitations period expired, the prosecution was timely in any event.