Filed 3/15/13  P. v. Fletcher CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE, | C063305 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F09282) |
| v. | |
| DRAMAINE FLETCHER, | |
| Defendant and Appellant. | |

Defendant and Siama Rivera were arrested in a sting operation after a team of Sacramento police officers investigating child prostitution saw an ad on Craigslist for a 14-year-old girl (Kimberly J.) they had previously encountered in a prostitution sting.  As a result of evidence uncovered at the hotel room where the sting took place, evidence uncovered in defendant's car, and of Kimberly J.'s preliminary hearing testimony and statements to officers, defendant was convicted of pimping a minor (count 1), pandering a minor (count 2), photographing a minor involving sexual conduct (count 3), possession of child pornography (count 5), intercourse with a minor age 14 or younger (count 6), lewd act (sexual intercourse) with a minor age 14 or younger (count 7), providing marijuana to a minor (count 8), lewd act (oral copulation) with a minor age 14 or younger (count 9), and lewd act (digital penetration) with a minor age 14 or younger (count 10).  The trial court sentenced defendant to a prison term of 19 years 4 months.

1

Defendant argues his federal Sixth Amendment right to confront the witnesses against him was violated because the trial court admitted the videotaped preliminary hearing testimony of Kimberly J., even though she was not constitutionally unavailable. He argues she was not constitutionally unavailable because the prosecution did not exercise due diligence in attempting to secure her presence at trial. We shall conclude the prosecution's efforts were reasonable, good faith efforts that were timely commenced.

Defendant also argues there was insufficient evidence of pandering, that his sentence for furnishing marijuana to a minor should have been stayed pursuant to Penal Code section 654[1], that the trial court abused its discretion in refusing to dismiss his prior strike conviction, and that the trial court did not exercise its informed discretion when it imposed consecutive sentences for counts 9 and 10.

We shall remand for the trial court to reconsider its sentencing choice on counts 9 and 10 because it is unclear whether the court understood that consecutive sentences were discretionary on those counts. We shall otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2008, the Sacramento Police Department's vice unit was examining Web sites trying to locate juveniles involved in prostitution. On April 8, Detective Derek Stigerts recognized a girl on Craigslist with whom they had dealt the prior year, when she was 13 years old. The girl's name was Kimberly J., and she was using the same false name, "Sparkle," she had used previously. Other ads associated with the same phone number showed Kimberly J. with another female. One of the ads read, "Come relax and unwind with us, two is better than one, Sparkle and Cinnamon." The wording was typical of a prostitution ad.

---

[1] Further references to an undesignated section are to the Penal Code.

2

Stigerts set up a "date" with the two girls. They made plans to meet at a Jack In the Box, where one of the girls, "Cinnamon," got into the car with the undercover officer, then went across the street with him to a motel. This procedure is typically used by prostitutes to see if the persons they meet are law enforcement and to ensure their own safety. Officer Corey Morgan was pretending to be the John (customer), because Kimberly J. knew Detective Stigerts from their previous encounter.

"Cinnamon," i.e., co-defendant Siama Rivera, informed Officer Morgan there would be two girls. Kimberly J. was inside the motel room. Rivera seemed nervous, and asked Morgan if he were a cop. She began touching his chest, stomach, and waist. Morgan lifted his shirt and turned around in a circle to show her that he was not wearing a wire. Rivera told Morgan to "show her [his] dick." She then grabbed his penis through his pants. Morgan asked if she had any condoms. Rivera said that he could get a massage and a dance. Morgan said, "from both of you?" He motioned to Kimberly J., who nodded "yes." They told him it would cost $250. Rivera then got a call on her cell phone. When she hung up she said, "all we do is massage and dance." She walked him to the door. When Morgan opened the door, other officers in the operation were waiting.

There were approximately 10 to 12 law enforcement officers working the operation. In addition to Officer Morgan, who went inside the motel room, there were surveillance officers spread out in the parking lot. Pimps are often in the parking lot or in other rooms in the motel. As several officers were approaching the room, a white Jaguar that was parked directly below the room quickly backed out of the parking space. Defendant was the driver of the Jaguar.

Officers stopped the Jaguar and found two cell phones inside. One of the phones contained a photo of Kimberly J. engaged in sexual activity. The officers also found a small amount of marijuana on defendant, a card key for the motel, a receipt for a different motel, and $130 cash.

In the motel room, officers found two packaged condoms, a backpack containing one-inch square baggies and men's boxer shorts, a size XXXL T-shirt, a starter kit for a Boost Mobile cell phone and a corresponding $20 phone card, a pair of men's shorts, two cell phones, a wireless Internet card two laptop computers, an address book and day planner, motel receipts in defendant's name, a photo of defendant holding a fan of money, an Amtrak receipt with the names of defendant and "Siama Olivo," and a large stack of DVDs including "Cross Country Pimping" and "Hustle and Flow." They found no cash in the room.

The officers also found a bag belonging to Kimberly J. The bag contained female clothing and other personal items, and included a pair of pink underwear that was "very similar" to the pink underwear worn by the girl featured on the Internet ads. The bag contained no illegal narcotics, no money, no computers, and no phones.

When Kimberly J. was picked up, she denied being involved in prostitution or knowing defendant. She admitted she knew the other woman in the room, whom she identified as "Cinnamon." She was taken to juvenile hall on an unrelated warrant. Kimberly J. was placed in a group home, from which she ran away and remained a runaway for approximately four months. After she returned and was interviewed, she said she was ready to tell the officers the truth and did not want to return to her old lifestyle.

Kimberly J. told Officer Pamela Rae Seyffert, who interviewed her, that she met defendant when she was on Watt Avenue near Interstate 80. She had a couple of cigars with her and wanted to get some marijuana. She saw defendant parked in his vehicle and approached him because she thought she might be able to get some marijuana from him. She told defendant she did not have a place to stay, and he offered her a room with him and his girlfriend at a Motel 6. She told defendant she was 18 years old.

She said that defendant took the photographs that appeared on the Internet. She said that during the time that she was with defendant and Rivera, she had walked the

4

streets twice as a prostitute, and the rest of the time had posted on the Internet for customers.

Kimberly J. explained that when she and Rivera posted on the Internet, defendant would leave as it was getting close to the time for the John to show up. After the "date" was over, they would contact defendant via the Nextel phone. She said that all the money she and Rivera earned turning tricks went to defendant. She denied that he demanded the money from her, but said she would never think of not giving the money to him. Defendant bought her food, marijuana, and paid for the room.

Kimberly J. testified at defendant's preliminary hearing. She was 14 years old at the time. She testified she started working as a prostitute about two months before she met defendant. Another man had taught her how to do it. She then worked as a prostitute for three other people. She was 13 when she started. When defendant first took her home with him, they went to a Motel 6. That was where she met Rivera. She confirmed that during the time she was with defendant she worked as a prostitute and advertised on the computer. She also walked the street. She and Rivera both worked as prostitutes and put their money together in a certain spot in the motel room. She knew the money was going to defendant because the only way she could stay with him was to make money and do her part. She knew that she was going to start prostituting because she needed money and a place to stay, but she was not sure she ever actually talked to defendant about it.

Defendant and Rivera took pictures of her. She and Rivera posted them as ads on the Internet. Either Kimberly J. or Rivera answered the calls they received from the Internet ads. Whenever a "date" came to the motel, defendant would leave. After the "date" she or Rivera would call defendant on the phone she had been given. She had sex with defendant once. She had oral sex with Rivera more than once. Defendant provided her with food and marijuana, and paid for the motel rooms.

Kimberly J. gave testimony regarding a number of photographs that were later introduced. One was a staged picture taken by defendant of oral sex between Kimberly J.

5

and Rivera. It was taken for the purpose of posting it on the Internet. There were other photos taken by defendant of Kimberly J. orally copulating Rivera, which were not staged photos. No one asked Kimberly J. to perform these sex acts; they just happened. Defendant was sometimes present, and sometimes was not present.

When Kimberly J. had spoken to a detective shortly after she was arrested, she had not wanted to admit knowing defendant because she did not want him to get into trouble for being involved in her prostitution. She was afraid he might go to jail for pimping and get into trouble for "messing with an underaged female." One of the rules of the street was that she was supposed to protect her pimp.

Detectives Stigerts and Morris gave expert testimony on the pimping of juvenile prostitutes. They testified that juvenile prostitutes are commonly advertised on Internet sites such as Craigslist. Detective Stigerts testified he had never seen a 14-year-old prostitute that worked without a pimp.

Detective Morris testified it was very common for pimps to have sexual relations with their prostitutes and furnish drugs to them. The authorities recover cell phones and computers in virtually every juvenile prostitution case. Computers are used to post Internet ads, and prostitutes communicate with their Johns via cell phones. It is common for juvenile prostitution to be advertised on the Internet, and Detective Morris testified he had never seen a juvenile prostitute advertised on the Internet using a motel room who did not have a pimp. Juvenile prostitutes are generally unable to put all of the parts of a prostitution operation together because they do not have identification, cars, or the ability to rent motel rooms.

It is common in juvenile prostitution cases to find photos such as those found on the cell phone in defendant's car. It is very common in juvenile prostitution cases to find photos of naked women in provocative poses. They are typically taken to be posted on the Internet, for the pimp's sexual gratification, to blackmail prostitutes, and to brag to

6

others in the prostitution industry. It is very common in cases of juvenile prostitution to find photos on cell phones of money or someone holding money.

Also on the cell phone found in defendant's car were text messages. One read, "Did u make dat money 4 me?" This represented a communication between a pimp and a prostitute, and is common to find in juvenile prostitution cases. There were also recruitment-type text messages on the phone.[2] These are common because a pimp will browse the Internet looking for prostitutes and send them text messages.

Detective Morris was not surprised that no money was found in the motel room. The pimp usually keeps the money, because allowing the prostitute to keep money would divest him of control. A forensic analysis of one of the laptops recovered from the motel room revealed that someone had used it to visit the Craigslist Web site 373 times. One of the user's names on the computer was "Siama." The photos on the computer were consistent with the images that were on the Internet ads and on the cell phone.

DISCUSSION

I

Preliminary Hearing Testimony Did Not Violate Confrontation Right

The trial court granted the People's motion to admit Kimberly J.'s videotaped preliminary hearing testimony. The People's motion informed the court that Kimberly J. was missing, and detailed the following efforts to locate her: (1) a no-bail warrant for her arrest was issued on January 14, 2009; (2) Detective Morris routinely searched for her on

---

[2] The phone contained the following messages:

"Hey there sexi ladies u both look like the only thing yall missing is a Bo$$ & betta direction in ur life get with mr & let me show u how 2." "[D]o u have room n yo life 4 somebody thats tryna show u a better way 2 do wat u doin? [S]ave this numba til you ready to put it to good use." "How u doin, jus seein if u were independent or if wanted get wit a real nig and get sum money." "I just want to compliment ur sexieness and inquire about ur happieness . . ma are u ready to put sum elevation n ur situation."

the Internet , which is how she was originally located for this case and for her prior case; (3) a special notice of warrant was issued to all Sacramento Police Department personnel, and to all California law enforcement agencies; (4) Kimberly J.'s mother was served with a subpoena on June 9, 2009, but when she appeared in court she said she had not spoken with Kimberly J. for several months and was unaware of her whereabouts; (5) the People checked with Sacramento County Child Protective Services (CPS), Alameda County CPS, San Francisco County CPS, Fresno County CPS, University of California, Davis, Medical Center, Kaiser South Sacramento Hospital, and Mercy General Hospital; and (7) the People contacted Kimberly J.'s last foster parents, who did not know of her whereabouts.

Defendant argues the admission of Kimberly J.'s preliminary hearing testimony violated his federal Sixth Amendment right to confront the witnesses against him. The United States Supreme Court has held that the testimonial statement of a witness absent from trial is admissible only where the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. (*Crawford v. Washington* (2004) 541 U.S. 36, 59 [158 L.Ed.2d 177, 197].) "A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial." (*People v. Herrera* (2010) 49 Cal.4th 613, 622 (*Herrera*).) There is no question here that defendant had a prior opportunity to cross-examine Kimberly J. at defendant's preliminary examination. The only issue is whether Kimberly J. was unavailable in the constitutional sense that the prosecution made a good faith effort to obtain her presence.

To establish unavailability, the prosecution must show that its efforts were reasonable under the circumstances presented. (*Herrera, supra*, 49 Cal.4th at p. 623.) We review the trial court's determination of disputed facts under a deferential substantial evidence standard, and review the application of those facts to the standard of due diligence independently. (*Ibid*.)

8

"Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citations.] In this regard, 'California law and federal constitutional requirements are the same . . . .' [Citation.]" (*Herrera, supra*, 49 Cal.4th at p. 622.) The prosecution shows due diligence where its efforts are timely, reasonably extensive, and carried out over a reasonable period. (*People v. Bunyard* (2009) 45 Cal.4th 836, 856.) In contrast, diligence is lacking where the prosecution's efforts to locate the witness are "perfunctory or obviously negligent." (*Id*. at p. 855.)

A. Facts Relating to Due Diligence

Kimberly J. appeared at the preliminary hearing on November 26, 2008. During her testimony she said she decided to tell the truth at the preliminary hearing because she was starting to get herself together, and because a lot of guys take advantage of little girls, and she did not want that to happen to anybody else, or for them to go through what she went through. Counsels' questioning of Kimberly J. was not completed on November 26, 2008, and she was ordered back on December 5, 2008. She returned on that date and completed her testimony.

The trial was initially set for April 20, 2009, but was later reset for June 15, 2009. As the facts were later revealed through the testimony of the prosecution's witnesses, Kimberly J. was living in a foster home when she gave her preliminary hearing testimony, but was removed from the home shortly thereafter for using drugs. She was taken to juvenile hall, and then placed in a group home in Fresno. The Sacramento County Probation Department was informed on January 14, 2009, that Kimberly J. had run away.

1. Early Efforts to Locate Kimberly J.

In January 2009, the probation department issued an arrest warrant for Kimberly J. Detective Morris testified that he had browsed prostitution-related Web sites over and over again looking for Kimberly J. His efforts to locate Kimberly J. in this fashion were

9

ongoing since learning that she was missing. He testified at the hearing in July that he had been searching "for the last several months." He also frequently drove down the prostitution stroll area in Sacramento looking for her.

Detective Morris testified that searching for a juvenile is challenging because they cannot rent motel rooms or cars. They have no driver's license or car registered to them. Previously, they had the most success locating Kimberly J. through Internet searches. He had attempted to search for her steadily on the Internet since she went missing.

2.  June 2009 Efforts to Locate Kimberly J.

In June 2009, a special notice of warrant was issued for Kimberly J. One notice went to the Sacramento Police Department, and one was sent to every law enforcement agency and district attorney's office in the state. On the day the state-wide notice was sent out, Detective Morris received a call from Foster City Police Department. They believed they had just dealt with Kimberly J. and sent a photograph of the person. It was not Kimberly J. No other response was received from the notices.

An investigative assistant in the district attorney's office testified that on June 24, 2009, she contacted Kimberly J.'s last known foster parent, who told her that Kimberly J. was removed from her home and taken to juvenile hall a few weeks prior to Christmas because she was using drugs. She heard that Kimberly J. was taken to a group home in Fresno. The investigator contacted CPS in Fresno County, Alameda County, Sacramento County, and San Francisco County. She also contacted the University of California, Davis, Medical Center, Mercy General Hospital in Sacramento, and Kaiser South Hospital in Sacramento. The investigator was able to obtain a Fresno address, and performed a skip trace on the address. The address was for a group home in Fresno. The manager there stated no one named Kimberly J. had been there in the four months she had been managing the home.

Detective Morris contacted Kimberly J.'s mother in June 2009, who told him she did not know where Kimberly J. was, but that Kimberly J. had called her from a blocked

10

number about two months earlier. She thought Kimberly J. might have been in the Bay Area, and was trying to make her way to Sacramento. Detective Morris spoke with Kimberly J.'s mother two other times, but she had not been contacted by Kimberly J. again. Detective Morris spoke with Kimberly J.'s foster mother, but she had not heard from her either.

### 3. Pretrial Hearing

The trial court granted the People's request to use Kimberly J.'s preliminary hearing testimony at trial. The court explained its ruling:

> "[T]he Court was persuaded by the testimony that there are certain unique circumstances that exist when one is confronted with the situation of searching for a juvenile runaway witness who has a fair amount of apparent street savvy as it's alleged that the witness in this case does. And I think one can certainly infer . . . that this witness is not keen on being located.
>
> "I understand the arguments of the defense and I will indicate that the Court's assessment is based on a totality of the evidence presented by the People. But the most compelling efforts were the ongoing attempts of law enforcement, Detective Morris, rather than those specifically initiated by the District Attorney's office. But I do attribute all of that to state action as it's clear that the motivation of Detective Morris included a successful presentation of that witness and availability of that witness at trial."

The court stated that in light of the timing of the outset of the trial (the court ruled on July 6, 2009, and the first witness was called on July 15, 2009), the People would have additional time to locate Kimberly J., and the court directed them to "continue to make diligent and persistent efforts and present proof . . . of their efforts to locate this witness."

### 4. Posthearing Efforts to Locate Kimberly J.

Detective Morris submitted a declaration detailing his additional efforts to locate Kimberly J. He contacted the police departments for Richmond, San Francisco, and Santa Clara, and the Alameda County Sheriff's Department. He sent another email to all

11

Sacramento Police Department personnel, and continued his Internet searches. Detective Stigerts continued the Internet search for Kimberly J. He also contacted the Fresno and Oakland police departments to no avail.

Jay Czajkowski, an investigator for the district attorney's office contacted a Sacramento County probation officer, who told him the department's last contact with Kimberly J. was when she was placed in a Fresno group home. Sacramento County Probation was informed on January 14, 2009, that Kimberly J. ran away from the home and had not been seen since. Czajkowski was given five former addresses for Kimberly J.: two group homes and three foster homes. The owner of the group home that was Kimberly J.'s last known address stated that Kimberly J. expressed during her short stay at the home that she planned to run away and work the streets in Oakland. The owner gave her opinion that nobody from the home would know where to find Kimberly J. Czajkowski made several attempts to contact Kimberly J.'s mother, but met with no success. He also spoke with Kimberly J.'s grandmother, but she had not had any contact with Kimberly J.

B. Discussion

Defendant's argument that the prosecution did not use due diligence in locating Kimberly J. is twofold. He argues first that the prosecution should have taken steps to ensure Kimberly J. did not go missing, and second that the prosecution's efforts to locate Kimberly J. were too little, too late.

1. The Prosecution Was Not Required to Prevent Kimberly J. from Running

Defendant argues the prosecution was aware the Kimberly J. was a habitual runaway, and that because of this, it should have incarcerated her until the trial, or sought to have her committed to the custody of the probation department as a material witness pursuant to section 1332.

When Kimberly J. was interviewed in juvenile hall following defendant's arrest, she was willing to talk about the events at the motel because she did not want to return to

12

her previous lifestyle. Kimberly J. told Officer Seyffert that she wanted to be placed in a foster home because she did not like the group home environment. Officer Seyffert told Kimberly J. that she would work on getting her placed in a foster home. Her efforts were apparently successful because when Kimberly J. gave testimony at defendant's preliminary hearing, she was living in a foster home in Elk Grove, California. Kimberly J. testified at the preliminary hearing that she was starting to get herself together.

When Kimberly J. finished her preliminary hearing testimony the trial court asked counsel if they wanted to have her on call until the end of the hearing, or if she could be excused. There was no request to have her on call, and she was excused. Given these facts, neither the prosecution nor the defense would have predicted that Kimberly J. would be removed from her foster home for using drugs and then placed in a group home from which she would run away. Certainly, the prosecution had no "foreknowledge" of her disappearance, as defendant argues.

Since Kimberly J. seemed to have made the decision to turn her life around at the time of the preliminary hearing and was in a foster home as she had wanted, the prosecution was not obligated to incarcerate her or commit her to a probation officer or other appropriate agency as a material witness to fulfill the requirements of due diligence. This is especially true since Kimberly J.'s preliminary hearing testimony was given in November 2008 and testimony did not begin in defendant's trial until July 15, 2009. (See *In re Francisco M.* (2001) 86 Cal.App.4th 1061, 1077 ["the longer the expected detention, the greater the showing required by the state to justify it"].)

2. Prosecution's Efforts to Locate Kimberly J. Were Reasonable

A witness is unavailable in the constitutional sense only if the prosecution's efforts to locate and produce the witness are reasonable. (*Herrera, supra*, 49 Cal.4th at p. 622.) "Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's

13

possible location were competently explored.' [Citations.]" (*Ibid*.) However, "the prosecution need not exhaust every potential avenue of investigation to satisfy its obligation to use due diligence to secure the witness." (*People v. Guiterrez* (1991) 232 Cal.App.3d 1624, 1641, fn. omitted, disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901.)

Here, Detective Morris testified he had steadily searched for Kimberly J. on the Internet sites he had previously used to find her since learning of her disappearance. We agree with the trial court that Detective Morris's efforts may be attributed to the prosecution, since he clearly had an interest in defendant's successful conviction. He was designated the case agent on the operation that culminated in defendant's arrest. The prosecutor designated him as the investigating officer in defendant's prosecution. He was a participant in defendant's arrest and a witness at the trial in which defendant was convicted.

Searching likely Web sites for Kimberly J. was a reasonable way to locate her, since that was how officers had found her in the past. Detective Morris's efforts were also timely, as they began as soon as he was notified that Kimberly J. was missing. His efforts, plus those of the investigators working for the district attorney's office, appear to have been sincerely designed to locate Kimberly J. and not merely perfunctory efforts. No leads were ignored, and every lead was competently explored. (See *Herrera, supra*, 49 Cal.4th at p. 622.)

The prosecution's efforts to locate and produce Kimberly J. constituted due diligence, thus Kimberly J. was a constitutionally unavailable witness. Defendant's confrontation rights were not violated by the use of her preliminary hearing testimony.

II

Sufficient Evidence of Pandering

Defendant was convicted of violating section 266i, pandering. Defendant's twelve-year sentence for violating this statute was stayed pursuant to section 654.

14

Defendant argues there is no substantial evidence he had the specific intent to encourage Kimberly J. to be a prostitute because there was no sufficient evidence that he " 'knowingly and purposefully' acted 'to persuade or otherwise influence' Kimberly J. to engage in any future acts of prostitution." Defendant argues Kimberly J. needed no persuasion to engage in prostitution, but did so on her own initiative in order to pay for her room and board.

As is relevant here, section 266i makes it unlawful to: (1) procure another for the purpose of prostitution; (2) cause, induce, persuade, or encourage another person to become a prostitute by threats, violence, or any device or scheme; (3) procure another as an inmate in a house of prostitution or a place where prostitution is encouraged or allowed; (4) cause, induce, persuade, or encourage an inmate of a house of prostitution to remain there as an inmate by promises, threats, violence or any device or scheme; (5) procure another for the purpose of prostitution or to enter any place where prostitution is encouraged or allowed by fraud or artifice or by duress of person or goods, or abuse of a position of confidence or authority; or (6) receive or give any money or thing of value for procuring another person for the purpose of prostitution.

The term "procure" as used in the statute means to assist, induce, persuade, or encourage. (*People v. Schultz* (1965) 238 Cal.App.2d 804, 812.) A house of prostitution is any place where prostitution is allowed or encouraged, including a motel room. (*Ibid.*) An inmate is a person who is "induced or encouraged to occupy, live or abide in a house of prostitution." (*Ibid.*) It is immaterial that the person consents to being a prostitute, or that the person is already a prostitute. (*People v. Zambia* (2011) 51 Cal.4th 965, 981; *People v. Hobson* (1967) 255 Cal.App.2d 557, 561.)[3]

---

[3] Defendant also asserts that his conviction for pandering must be reversed because there was insufficient evidence that Kimberly J. was not already a prostitute. He recognizes that the California Supreme Court has held that: "the proscribed activity of encouraging

There was sufficient evidence that defendant assisted or induced Kimberly J. to be a prostitute, and that he assisted or induced her to be an inmate in a house of prostitution (the motel room). Kimberly J. testified that she knew all of the money she made was going to defendant, and that she believed this was the only way that she could stay with him -- to make money and do her part. Defendant gave Kimberly J. a cell phone to assist her in making "dates" from her Internet postings. Defendant took pictures of Kimberly J. that were used to post ads for prostitution on the Internet. During the time Kimberly J. was with defendant, he provided her with food and marijuana, for which she did not pay. He never asked her to pay for it. All of this evidences a tacit agreement between Kimberly J. and defendant that he would pay for her room, board, and drugs if she would sell herself as a prostitute and give him her earnings.

Furthermore, a defendant's specific intent may be and usually must be inferred from the circumstances of the crime. (*People v. Kaiser* (1980) 113 Cal.App.3d 754, 767.) Defendant's actions in paying for Kimberly J.'s room, board, and drugs, and in taking pictures for her to use to advertise her services as a prostitute, and in giving her a phone to facilitate her "dates" are circumstantial evidence that he had the specific intent to assist, induce, persuade, or encourage her for the purpose of prostitution.

### III
### Section 654

Section 654 provides that an act or omission which is punishable in different ways by different provisions of law may not be punished by more than one provision. Although the statutory language applies only to a single act or omission, the statute has been construed to apply where several offenses are committed during " 'a course of

---

someone 'to become a prostitute,' as set forth in section 266i, subdivision (a)(2), includes encouragement of someone who is already an active prostitute . . . ." (*People v. Zambia, supra*, 51 Cal.4th at p. 981.) He nevertheless raises the issue to preserve it for appellate review. We are bound by the Supreme Court's holding in *Zambia, supra*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)

conduct deemed to be indivisible in time.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335, quoting *People v. Beamon* (1973) 8 Cal.3d 625, 639.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331, 334.)

Defendant contends the trial court erred in failing to stay the sentence in count 8, furnishing marijuana to a minor, because furnishing marijuana to Kimberly J. was incident to his objective of pimping Kimberly J.[4] We disagree because the acts were divisible in time. Multiple crimes do not amount to a single indivisible course of conduct where the defendant had a chance to reflect between offenses. (*People v. Massie* (1967) 66 Cal.2d 899, 908*; People v. Kwok* (1998) 63 Cal.App.4th 1236, 1255.)

Whether defendant's acts constituted an indivisible course of conduct or a divisible transaction is a question of fact for the trial court, which we review for substantial evidence. (*People v. Kwok, supra,* 63 Cal.App.4th at pp. 1252-1253.) Kimberly J. testified that defendant gave her marijuana when she first met him and

---

[4] Defendant misrepresents the record when he claims the probation report advised staying the sentence on count 8, and the trial court tentatively agreed. While the probation report *quoted defendant's trial counsel's* argument that the punishment for the charge of providing marijuana to a minor should be stayed, its recommendation was that defendant be given a consecutive term for count 8. The trial court, in tentatively advising counsel of its decision with respect to the defense's 654 arguments, indicated that it was inclined to agree with the defense that the punishment for the pornography charges should be stayed, implying to defense counsel that there was no need to further argue that point. But the court then recognized that defense counsel had made the same argument with respect to the furnishing a minor and sexual assault charges, and indicated it did not "want to take away your opportunity to argue those . . . ."

17

throughout the time she knew him. She was with him approximately one month. She, defendant, and Rivera all three smoked the marijuana together. This was sufficient evidence that defendant gave Kimberly J. marijuana several times, that she smoked it with him, and that she did so when she was not performing for him as a prostitute.[5] Since defendant supplied Kimberly J. with marijuana throughout the time she was with him, there were multiple opportunities for defendant to reconsider his decision to supply a minor with marijuana. This was substantial evidence of a divisible transaction, and the trial court did not err when it declined to stay the sentence on count 8.

IV
Prior Strike

Defendant claims the trial court abused its discretion when it failed to strike his prior serious felony conviction. A trial court has discretion to dismiss a prior felony conviction allegation in cases brought under the Three Strikes law. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530.) The refusal to strike a prior conviction allegation is reviewed for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) The burden is on the defendant to show that the decision was so irrational or arbitrary that no reasonable person could agree with it. (*Id.* at p. 376.) The circumstances where no reasonable person could agree with the trial court's decision must be "extraordinary." (*Id.* at p. 378.)

Defendant argues he was entitled to have his prior conviction allegation dismissed because his current crimes are not violent or life threatening, and because his prior strike was "from a brief period of aberrant behavior."

We find no abuse of discretion. Defendant's case is not extraordinary. Even though defendant's current offenses were nonviolent offenses, they were not minor felonies. Furthermore, defendant's criminal background is more extensive that a brief

---

[5] Defendant was not in the room when Kimberly J. had her "dates."

period of aberrant behavior. As a juvenile, he was adjudged a ward of the court after robbing a bank. The wardship terminated on October 30, 1995, and less than eight months later, he committed another bank robbery. A month later he used a firearm to rob two men in separate incidences. On February 26, 1998, defendant was convicted for these crimes and sentenced to four years in state prison. He was paroled, but in 2001 he violated parole and was sentenced to finish his term. He was discharged from parole on March 8, 2004. His present offenses were committed in 2008.

The trial court acted well within its considerable discretion when it refused to dismiss the prior conviction allegation.

V

Sentencing

By failing to raise any objection below, defendant has waived his claim that the case must be remanded for resentencing because the trial court failed to give its reasons for consecutive sentencing. (*People v. Neal* (1993) 19 Cal.App.4th 1114, 1117.)

Defendant also claims the trial court should have imposed concurrent, rather than consecutive sentences on counts 6 (unlawful intercourse with a minor), 8 (furnishing marijuana to a minor), 9 (oral copulation with a minor), and 10 (digital penetration of a minor). He argues that counts 6, 9, and 10 occurred on the same occasion, and count 8 occurred on the same occasion as the pimping count.

The People concede that we should remand the matter for resentencing only on counts 9 and 10 to allow the trial court to exercise its discretion to impose consecutive or concurrent sentences on counts 9 and 10. We agree.

The basis for the convictions on counts 6, 9, and 10 was Kimberly J.'s preliminary hearing testimony. She testified that she had sexual intercourse with defendant only once (count 6). She also had oral sex with defendant (count 9). She thought it was the same time as the sexual intercourse, but she was not sure. Defendant also put his fingers inside

19

Kimberly J.'s vagina (count 10). This occurred at the same time she had sexual intercourse with him.

Section 667, subdivision (c)(6), mandates consecutive sentencing for any current felony that is "not committed on the same occasion, and not arising from the same set of operative facts." Consecutive sentences for multiple current felonies that are committed on the same occasion and that arise from the same set of operate facts are not mandatory by implication. (*People v. Hendrix* (1997) 16 Cal.4th 508, 512-513.) The trial court retains discretion to sentence a defendant for such convictions either concurrently or consecutively. (*Id*. at p. 514.)

Where the record fails to disclose whether the trial court understood it had discretion impose concurrent terms, the matter should be remanded to the trial court for the court to exercise its sentencing discretion. (*People v. Hall* (1998) 67 Cal.App.4th 128, 137-138.) If the trial court believed it had discretion to impose a consecutive or concurrent term, it was required to provide a statement of reasons for choosing a consecutive term. (*Id*. at p. 138) No statement of reasons is required if consecutive terms are mandated. (*Ibid*.)

The trial court did not provide a statement of reasons for counts 6, 9, and 10. When sentencing defendant on counts 9 and 10, the court stated: "As to Count Nine, a violation of [Penal Code section] 288 [subdivision] (c)(1), I will order an additional consecutive sixteen-month sentence. [¶] As to Count [Ten], a separate violation of Penal Code Section 288 [subdivision] (c)(1), I will order the defendant be imprisoned in the state prison for sixteen months, and that -- again, that's consecutive."

Counsel did not argue whether the sentences for counts 9 and 10 should be concurrent or consecutive. The probation report stated that defendant was "subject to mandatory consecutive sentencing pursuant to Penal Code Section 667 [subdivision] (c)(6)." Specifically as to counts 9 and 10, the probation report recommended the sentences be served consecutively.

20

There being no way to determine whether the trial court was aware of its discretion to impose consecutive or concurrent sentences for counts 9 and 10, we shall remand to the trial court for it to exercise such discretion.

However, a consecutive sentence for count 8 was mandated under the terms of section 667, subdivision (c)(6), because the facts underlying the furnishing a minor with marijuana charge did not occur on the same occasion as the facts underlying the pimping charge. As noted earlier, defendant furnished Kimberly J. with marijuana throughout the time she knew him, and she smoked marijuana with him. Since defendant was never in the room when Kimberly J. was performing as a prostitute, the crimes were not committed on the same occasion and did not arise from the same set of operative facts.

### DISPOSITION

The judgment is reversed with respect to imposition of consecutive sentences for counts 9 and 10, and the cause is remanded for a new sentencing hearing in which the trial court is to exercise its discretion to impose consecutive or concurrent sentences. In all other respects the judgment is affirmed.


           BLEASE     , J.


We concur:


    RAYE     , P. J.


    DUARTE    , J.


21