Filed 10/25/24  P. v. Janks CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D081915 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN420772) |
| JADE SASHA JANKS, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

Michelle C. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

In 2023, a jury convicted Jade Sasha Janks of first degree murder (Pen. Code,[1] § 187, subd. (a)). She appeals, contending the People failed to establish the corpus delicti for first degree murder and that they did not prove that she did not act in a heat of passion resulting from provocation. Janks further alleges the trial court erred when it did not sufficiently instruct the jury on the meaning of provocation in second degree murder and that she received ineffective assistance of counsel because counsel did not request further pinpoint instruction. Together, Janks asserts these errors are cumulatively prejudicial and necessitate reversal. We affirm.

## FACTUAL BACKGROUND

Thomas Merriman married Janks's mother around the time Janks was 14 years old. Janks moved away from the family when she was 23 years old. She stopped speaking with her mother in approximately 2008, and everyone grew apart. In April 2020, Janks and Merriman coincidentally moved into neighboring accessory dwelling units in Solana Beach.

Following a purported series of falls, Janks summoned medical assistance to Merriman's home on or around December 15. Merriman entered a nursing facility on December 23, 2020 to receive physical therapy rehabilitation. To facilitate his recovery, doctors prescribed Merriman oxycodone for pain relief, lorazepam for anxiety, and zolpidem as a sleep aid. The zolpidem sleep aid was administered at bedtime and dispensed in a blister pack.

Two to three days after Merriman was admitted to the hospital, Janks entered his home to clean and discovered intimate images of herself on Merriman's computer. The years-old images were taken by Janks and with her consent; she believed they were stored on old electronics. She did not

---

[1] Further undesignated statutory references are to the Penal Code.

2

provide the images to Merriman.  Investigators later discovered only one such image.  When she described finding the photos to Sarah Jacob and Justin Nuckolls, Nuckolls observed her to be nonchalant.  Conversely, Jacob described Janks as "shaken" and "uncomfortable."  Following the disclosure, Jacob once came to "stand guard" while Janks showered.

Within days of discovering the photos, on December 23, 2020, Janks began communicating with Alan Roach, a self-proclaimed "fixer."[2]  Janks knew Roach to be someone to reach out to when she "needed help or discretion."  She told Roach she was afraid Merriman would come back from the nursing facility unannounced, learn she changed his screen saver, enter her unlocked home, and harm her in some way.  This expressed fear was in spite of the fact that Merriman struggled to walk more than ten feet using his walker.  Janks requested Roach come watch her shower to "make sure that [she] was safe."  The day before Merriman returned home, Janks texted Roach that she had an easy solution and said she needed to speak with him.  This message followed a series of attempts to meet and formalize a plan.  She testified at trial that the plan was to confront Merriman and demand he delete the photos and move away.  Janks never confronted Merriman.

Merriman was stable, meeting his physical therapy goals, and feared losing his medical coverage in the new year.  In line with his progress and concerns, he expressed his desire to return home, which his care team approved.  Merriman was alert, oriented, coherent, and mobile at his discharge from the facility at approximately 11:19 a.m. on December 31.  Merriman was ineligible for direct re-admission to the nursing facility; he would need to visit an emergency room if his health declined following his

---

[2]    The parties stipulated that attempts to contact Alan Roach were unsuccessful and that he was not available to testify as a witness.

3

release. Although he was mobile at discharge, Janks texted Roach, "He can barely walk in a walker." Janks gave Merriman a ride home from the rehab facility, but later denied knowing where Merriman went after they returned to their homes. Facility staff did not administer any lorazepam to Merriman on the day of his discharge, though they did give him a dose of zolpidem at approximately 12:30 a.m. in the early morning on that date. Janks testified that Merriman found and consumed her Adderall and gabapentin while they were in the parking lot of the nursing facility.

At 11:30 a.m., Janks again texted Roach, explaining "[she] just dosed the hell out of him" and that she was "stopping for whiskey" then visiting a hardware store to "stall." At 11:31 a.m., Janks completed a purchase at a liquor store for a variety of alcoholic beverages, which she asserted was at Merriman's request. Next, Janks visited a drugstore between approximately 11:42 a.m. and 11:50 a.m. At approximately 12:04 p.m., Janks checked out from a hardware store, purchasing black disposable gloves, towels, red cord, zip ties, spray paint, and a pair of work gloves. While she was in the store, she tried calling Roach. At trial, Janks testified that she was stalling to give Roach time to arrive so they could confront Merriman about the photographs. She estimated she left Merriman unattended in the car for approximately 24 minutes while she was in the hardware store. Janks asserted that Merriman was less agitated when she returned from the hardware store, that he had unrestricted access to pills she left in the car and the medication he was sent home with, and that he was no longer requesting additional medication.

Janks testified that when she arrived at his home, Merriman fell twice after transferring from her car to the walker, despite her assistance. During the falls, she said he sustained injuries to his head, arm, and hand. She was

4

not wearing gloves while helping him transfer to the walker and did not testify to when she wore the gloves found in her vehicle. Approximately 90 minutes after leaving the nursing facility, Janks reached out to Roach again around 12:30 p.m., complaining that he was not closer to assist her because she was not strong enough to carry Merriman on her own. A neighbor described Merriman as speaking gibberish and "talking like somebody who was . . . on drugs or something."

At 12:44 p.m., Janks texted a friend of hers, Adam Siplyak, "911. Call me." When the two spoke, Janks told Siplyak that she needed help putting Merriman in a wheelbarrow to get him home. Siplyak suggested Janks contact a mutual friend for assistance, as he was at a tattoo appointment. At approximately 12:48 p.m., Janks contacted Charles Geary, the mutual friend, to ask for his help moving Merriman into his house; she told him Merriman was heavily medicated. Geary was out of town and unable to assist Janks. Janks then called Jacob and Nuckolls seeking their assistance getting Merriman back into her car. Janks told Jacob "he is alive" and implored her to "[not] ask any questions." Janks told them Merriman fell using his walker; Merriman did not speak except to complain of pain. Nuckolls assisted Janks in getting Merriman into the car and both he and Jacob believed Janks was taking Merriman to the hospital. Janks departed from her home at the same time Jacob and Nuckolls did.

Janks reached out to Roach at 1:25 p.m. to share that Merriman was not feeling well and that she was going to call the hospital. She testified that she tried calling the nursing facility before driving to the facility to ask for assistance and being turned away. Janks asserted that she "took every long way possible" back towards their homes. Despite claiming she was turned away from the nursing facility, Janks did not try to take Merriman to other

5

health service providers, did not call the nearby hospital, and did not summon emergency assistance. Janks again inquired whether Roach could come assist her in getting Merriman into his own home. When Roach was not immediately available, Janks texted again at 2:28 and 2:38 p.m., "Really? He's waking up. I didn't want to be the one to do this." Roach promised the assistance of a "partner" who could be trusted, and Janks told him, "[I]t's going to be weekend at Bernie's."[3]

At approximately 3:00 p.m., two hours after Nuckolls helped get Merriman into the car, Roach called Brian Salomon to request help getting Merriman into Janks's house. Roach told Salomon to get gloves and go to Janks's home; Salomon purchased gloves at a drugstore on the way. Janks met him on the driveway before inviting him into her home and telling him that she drugged her stepfather and that he was in the backseat. Salomon inquired whether Janks needed help getting Merriman into his own house, and she responded yes and explained she had a pillowcase over his head and a rope around him. Salomon inquired again whether Janks wanted him to move Merriman into the house, and Janks explained that she wanted him to strangle Merriman and then bring him inside. Salomon excused himself to call Roach, then he ran from Janks's home and called his ride to pick him up. Salomon called Roach from the car and told him he was "out" and "not doing this." He did not look inside Janks's vehicle. Roach texted Janks that he had only ordered Salomon to help get Merriman out of the car and that he "didn't want [Salomon] involved like that."

---

[3]   *Weekend at Bernie's* is a film where "Bernie has died but his corpse is dressed up and brought to parties as if he were still alive." (*Ellis v. Diffie* (1999) 177 F.3d 503, 505.) In the film, Bernie is killed by an overdose and is limp while moved around.

Roach suggested Janks get Merriman to his own house and then get away from him; Janks responded that she could not carry him alone and that she couldn't "keep a kicking body in [her] trunk." She said he was beginning to become more alert and that she was about to "club him on the head." When Roach did not respond, Janks checked a publicly accessible Sheriff's database to see if he had been arrested.

That evening at approximately 7:30 p.m., after Siplyak's tattoo was complete, he drove to Janks's house after she confirmed that she could trust him and that he was alone. When he arrived, he entered, knowing her door was always unlocked. Once inside, Janks explained that she found the intimate images of herself on Merriman's computer and killed him. She appeared calm while she explained that she drugged him in her car before putting a bag over his head and lightly strangling or suffocating him. She requested Siplyak's help in moving Merriman's body next door to his own home. He declined and endeavored to hide that he was in Janks's home that night.

Later in the evening, when Roach advised Janks to remain patient, she texted him that "[i]t's too late for patients [sic]. That's not the help I need. I reacted." She explained that she had "hours till bruising shows" and stated again that she needed assistance getting Merriman into his home. At some point during that evening, Janks entered Merriman's home to pour alcohol on his computer and smash what she believed to be his hard drive.

Janks reached out to Jacobs and Nuckolls for additional assistance with Merriman on January 1, 2021. Janks testified that when she checked on Merriman that morning, she believed he was sleeping but thought he might be dead. She did not call for emergency services and instead tried to contact Roach for assistance again. She did not receive a response from

7

Roach, and then went to get a wheelchair from the nearby hospital. Although Janks reported she had not yet confirmed Merriman's death, she did not seek assistance for Merriman at the hospital when she took a wheelchair and loaded it in through a window instead of through the SUV's back hatch. After placing the wheelchair into the back of her vehicle with Merriman's body, Janks returned to Merriman's driveway and reportedly confirmed Merriman was cold to the touch and dead. She attempted to pull him out into the wheelchair but was unsuccessful and he instead fell to the ground of his driveway. She put a blanket over him before stacking boxes to disguise his corpse as a pile of debris.

The same day, Siplyak called a sheriff's deputy to report the murder. Investigators called Merriman's brother to inquire whether he knew of his whereabouts. He did not know where Merriman was, but called and texted his phone to let him know the police were looking for him. Janks returned his call on Merriman's phone and stated Merriman was not available. Janks told Roach she talked with Merriman's brother, but that "if anyone knew or thought anything, the place would be swarming." Investigators also called Merriman's phone but received no answer. Detectives attempted a welfare check at Merriman's address but did not find him.

Janks warned a neighbor that she left a pile of trash on Merriman's driveway because she didn't want him to look into it or otherwise see the pile as suspicious. She also texted Roach about the pile of trash repeatedly, explaining she would "not be able to relax until [she cleared the trash]." While police were at Merriman's house, Janks left her residence and police officers initiated a stop, at which point Janks texted Roach with the instruction to "lose [her] number" because she was being pulled over. After obtaining a search warrant, investigators searched both Janks's home and

8

Merriman's. Janks declined to disclose the location of Merriman's body during her initial interview with police. They later located Merriman's body under a pile of trash on his driveway at approximately 7:00 a.m. on January 2.

DISCUSSION

1. *Corpus Delicti*

    a. *Additional Background*

Police officers photographed injuries to Merriman's face, and two experts identified petechiae near his eye. Petechial hemorrhages are small burst blood vessels that appear anywhere above where pressure is put on the neck in a case of strangulation. They may also be caused by the blood settling after death. A toxicology panel revealed Merriman had lidocaine, gabapentin, oxycodone, trazodone, and zolpidem in his system. Nursing facility staff administered a lidocaine patch to Merriman prior to his discharge that was found on his body. The lorazepam, trazodone, gabapentin, zolpidem, and alcohol all have sedative properties, especially when combined. Merriman's death was classified as homicide caused by acute zolpidem intoxication, contributed to by his underlying health conditions.

An expert testifying for Janks testified that "an isolated [zolpidem] overdose [is] just not often too dangerous." He also testified that liver impairment might make it harder for someone like Merriman to clear zolpidem from his system. Nevertheless, he asserted Merriman's zolpidem levels were below what he generally believed to be lethal.

Inside Janks's vehicle, investigators discovered both her cell phone and Merriman's. They also found two black disposable gloves, alcohol, and prescription drugs. They similarly found a variety of bags, towels knotted

9

into a chain, red cord tied in a loop, and a blood-stained pillow along with other pillows. Another red stain was identified on the rear driver's side seat.

Merriman's DNA was found inside a paper bag removed from the car. Both Janks and Merriman contributed DNA to the disposable gloves, the knotted towels, and the red cord tied in a loop. Janks testified that she used the knotted towels to try and hoist Merriman up from the driveway, and the red cord to secure his walker. The blood on the rear seat and the pillows was determined to be Merriman's. Janks's DNA was found on both of Merriman's hands, and she did not offer testimony to her use of the gloves or how Merriman's DNA transferred to them.

The zolpidem Merriman was discharged with clearly indicated it was to be taken at bedtime. At least four pills were taken out of the order used by the nursing facility, and Janks's DNA was found where the pills were pushed out; Merriman's DNA was not detected on the blister pack.

Aside from the petechiae, Merriman's body did not exhibit physical signs of severe strangulation or suffocation, though he did have two abrasions near his chin. An expert testified that fatal strangulation requires less force than opening a can of soda and may not leave physical signs. Further, fatal suffocation or smothering using a plastic bag may not leave physical signs. Similarly, strangulation over a pillowcase or other barrier would be unlikely to leave abrasions on the neck. Intoxicated victims of suffocation are not likely to show signs of resistance. Janks denied drugging and asphyxiating Merriman.

b. *Guiding Principles*

" 'To convict an accused of a criminal offense, the prosecution must prove that . . . a crime actually occurred.' [Citation.] '[T]he corpus delicti or body of the crime . . . cannot be proved by *exclusive* reliance on the

defendant's extrajudicial statements.' " (*People v. Dalton* (2019) 7 Cal.5th 166, 218.) Thus, the corpus delicti rule requires corroboration of the defendant's out-of-court statements for purposes of proving the commission of a crime. (*People v. Krebs* (2019) 8 Cal.5th 265, 317.) In *Krebs*, the Supreme Court described the quantum of proof sufficient to satisfy the rule:

> " 'The amount of independent proof of a crime required [to satisfy the corpus delicti rule] is quite small.' [Citation.] The prosecution need not adduce 'independent evidence of every physical act constituting an element of an offense.' [Citation.] Instead, it need only make 'some indication that the charged crime actually happened,' so as to ensure 'that the accused is not admitting to a crime that never occurred.' " (*Ibid*.)

Only " 'slight' " independent evidence need be present to satisfy the corpus delicti rule. (*Dalton*, at p. 218.) The evidence need not rule out the possibility that Merriman died from noncriminal causes; "the corpus delicti rule is satisfied 'by the introduction of evidence which creates a reasonable inference that death could have been caused by a criminal agency . . . even in the presence of an equally plausible noncriminal explanation of the event.' " (*People v. Towler* (1982) 31 Cal.3d 105, 117 (*Towler*).) "[W]e independently review whether the prosecutor put forth the requisite independent proof to establish the corpus delicti." (*In re D.A.* (2018) 24 Cal.App.5th 768, 771.)

Section 187, subdivision (a) provides in relevant part: "Murder is the unlawful killing of a human being . . . with malice aforethought." The jury received instruction on the elements of murder under section 187, deliberation and premeditation, and the corpus delicti rule.

     c.    *Analysis*

It is undisputed that Merriman died; the only issue was whether his death was caused by the criminal act of another. Because none of the testifying experts deemed the amount of zolpidem in Merriman's system to be

fatal on its own and because Merriman's body did not bear severe injuries, Janks argues that the prosecution failed to satisfy the corpus delicti rule and convicted her on her statements alone. However, there is evidence in the record, independent of Janks's statements, sufficient to satisfy the corpus delicti rule.

When Merriman left the nursing facility, he was stable, coherent, and mobile with the assistance of his walker. After spending approximately 90 minutes with Janks, and after she told Roach she "dosed the hell out of him," he was mumbling, slurring, and struggling to stand or otherwise move. Witness observations of Merriman's condition corroborate that Merriman was drugged between leaving the nursing facility and his arrival at his home. Toxicology results further corroborate Janks drugging Merriman, as he died with toxic levels of zolpidem in his system. Although Janks argues Merriman may have taken sleeping pills while he was unattended for approximately 34 minutes, his DNA was not detected on the blister pack of zolpidem— Janks's was. Janks's DNA on the pill pack corroborates her statement that *she* dosed Merriman. We observe that Janks made that statement about dosing Merriman before Merriman was left unattended in her vehicle.

Further, the DNA evidence on the red cord corroborates the statements Janks made to Salomon prior to asking him to kill Merriman. She told Salomon that she drugged Merriman and had a rope around him in her vehicle, before asking Salomon to asphyxiate and kill Merriman. Consistent with being tied around Merriman, the red cord recovered from Janks's vehicle had Merriman's DNA on it. Additionally, Roach's text message to Janks corroborates the request she made to Salomon, because Roach didn't want his friend involved "like that."

12

Similarly, the extrajudicial statements Janks made to Siplyak are further supported by DNA evidence. She told Siplyak that she put a bag over Merriman's head and asphyxiated him. Merriman's DNA was found inside one of the bags located inside the vehicle, corroborating a bag being placed over his head. A jury could reasonably infer that Janks wore the disposable gloves to asphyxiate Merriman, transferring his DNA to them at that time. The petechiae near Merriman's eye further support Janks's explanation that she asphyxiated and killed him. This is true even where there is an equally plausible noncriminal explanation for the injury, such as blood settling after death. (See *People v. Jacobson* (1965) 63 Cal.2d 319, 327.)

We conclude the evidence is sufficient to support a reasonable inference that death could have been caused by Janks's criminal agency and that the People did not rely solely on Janks's inculpatory statements. (*Towler, supra*, 31 Cal.3d at p. 117.)

2.     *Heat of Passion*

Separately from her argument that no crime was committed, Janks argues that the crime that she committed was the result of intense emotion and in the heat of passion. She asserts there is not substantial evidence that demonstrates she premeditated and deliberated the murder.

We review claims of insufficient evidence under the substantial evidence standard. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) In a criminal case, we review the entire record in the light most favorable to the judgment for substantial evidence that would allow any reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Substantial evidence must be "reasonable, credible, and of solid value." (*Ibid.*) Such evidence can include not only circumstantial evidence, but also the reasonable inferences that can

13

be drawn from such evidence. (*People v. Soriano* (2021) 65 Cal.App.5th 278, 286.) Reversal would be appropriate only if "upon no hypothesis whatever is there sufficient substantial evidence to support" the conviction. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

A killing under section 187, subdivision (a) is premeditated if the defendant "decided to kill before completing the act[s] that caused death." (CALCRIM No. 521.) A killing is deliberate if the defendant "carefully weighed the considerations for and against [her] choice and, knowing the consequences, decided to kill." (*Ibid*.) Thus, "[a]n intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

Although the exact date Janks discovered the images is unclear, it is evident she discovered them at least eight days before Merriman returned home. She spent those eight days communicating with a "fixer" and replacing his couch, and calling the nursing facility, not Merriman, to "keep up normal appearances." When Roach advised her not to spend too much time in Merriman's apartment, she was unconcerned because the police had not responded to his initial health incident.

As Merriman's return drew closer, Janks reached out to Roach to make more firm plans. The day of Merriman's discharge from the nursing facility, she drugged him, then drove around to stall and give Roach time to meet them. She did not want to carry out the plan herself. When her plan to transfer Merriman to his home was unsuccessful, she summoned her friends to help lift him back into her car. Janks's friends believed she would take him for medical attention. However, despite his altered state and injuries from repeated falls, Janks did not assist Merriman in accessing medical

14

services.  She drove around, again inquiring when Roach could help her. Roach sent Salomon to assist Janks and she asked Salomon to kill Merriman. When that was unsuccessful, Janks placed a bag over Merriman's head and asphyxiated him.  She then told Siplyak what she had done and asked for his help carrying Merriman inside to his own house.  He did not wish to cover up a killing and left.  When Janks was unable to convince anyone to assist her in moving Merriman's body, she pulled him from the back of her vehicle and left him on his driveway, covered in trash.  She conceded that she did not confront Merriman about the photos on the day of his death.

On this record, we conclude there is ample evidence for a reasonable trier of fact to find, beyond a reasonable doubt, that Janks premeditated and deliberated Merriman's murder.

3. *Jury Instructions Regarding Provocation*

Janks contends that the jury received insufficient instruction regarding provocation.  She further asserts that counsel's decision not to seek further pinpoint instruction constituted ineffective assistance of counsel.

a. *Additional Background*

Over the People's objection, Janks requested both CALCRIM No. 522 and CALCRIM No. 570.  Janks did not request additional pinpoint instruction to further define provocation.

The trial court then instructed the jury with CALCRIM No. 522, regarding provocation, as follows:  "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter." Janks's counsel did not request clarification or amplification of that instruction.  The jury also received instruction based on CALCRIM No. 200 that "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

15

The court also read CALCRIM No. 570, which defined the difference between murder and voluntary manslaughter based on a sudden quarrel or the heat of passion, given as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1.  The defendant was provoked;

"2.  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured her reasoning or judgment;

"AND

"3.  The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as [the court has] defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant was simply provoked.  The defendant is not allowed to set up her own standard of conduct.  You must decide whether the

16

defendant was provoked and whether the provocation was sufficient.  In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reaction from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder."

b.    *Instructional Error*

We review a claim of instructional error de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Alvarez* (1996) 14 Cal.4th 155, 217.)  "In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant.  [Citation.]  We consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions."  (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*).)

CALCRIM No. 522 permits the jury to use evidence of provocation in considering whether the crime was first or second degree murder.  The instruction is a pinpoint instruction that a defendant may request when the evidence supports the theory; the court does not have a sua sponte duty to provide the instruction.  (*People v. Thomas* (2023) 14 Cal.5th 327, 384.)

17

We reject Janks's claim of instructional error because any further instruction explaining how provocation must affect the defendant so as to reduce first degree murder to second degree murder is a pinpoint instruction that the court has no sua sponte duty to give. (See *People v. Souza* (2012) 54 Cal.4th 90, 118; *People v. Rogers* (2006) 39 Cal.4th 826, 878–879; *People v. Mayfield* (1997) 14 Cal.4th 668, 778; *People v. Lee* (1994) 28 Cal.App.4th 1724, 1732–1734.) Further, in this context, the term "provocation" is not used in a technical sense peculiar to the law. (*Hernandez, supra*, 183 Cal.App.4th at p. 1334.)

"Pinpoint instructions 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case' " and must be given on request " 'when there is evidence supportive of the theory . . . .' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 348–349.) Such instructions relating not to a defense, but rather to an attempt to raise a reasonable doubt as to an element of the crime, need not be given sua sponte but must be given only upon request. (*People v. Anderson* (2011) 51 Cal.4th 989, 996–997.)

Janks argues that because "provocation" is defined in CALCRIM No. 570, the word, as used in CALCRIM No. 520, carries a separate meaning requiring definition. Under this exception, she argues, a sua sponte duty does arise to further define the word. Janks does not point to any specific evidence that the jury put undue focus on the standards expressed in CALCRIM No. 570.

We can only reasonably conclude that "provocation" in CALCRIM No. 522 retains its ordinary meaning. " 'If a statutory word or phrase is commonly understood and is not used in a technical sense, the court need not give any sua sponte instruction as to its meaning.' " (*People v. Lucas* (2014) 60 Cal.4th 153, 296.) A court's obligation to give instruction without request

18

by either party " 'comes into play when a statutory term "does not have a plain, unambiguous meaning," has a "particular and restricted meaning" [citation], or has a technical meaning peculiar to the law or an area of law.' " (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.)  A word has a technical legal meaning requiring clarification by the court when its definition differs from its nonlegal meaning.  (*People v. Cross* (2008) 45 Cal.4th 58, 68.)

We disagree that CALCRIM No. 522 uses the word provocation in any sense other than its ordinary meaning as " 'something that provokes, arouses, or stimulates' " or " 'the defendant's emotional reaction to the conduct of another . . . .' "  (*Hernandez, supra*, 183 Cal.App.4th at p. 1334.)  Our Supreme Court has stated as such in a similar context.  (See *People v. Cole* (2004) 33 Cal.4th 1158, 1217–1218 [provocation as used in CALJIC No. 8.73 "bore [its] common meaning, which required no further explanation in the absence of a specific request"]; *People v. Ward* (2005) 36 Cal.4th 186, 215 ["[t]he evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state"].)  And this court so held in *Hernandez*, when we explained that in the context of CALCRIM No. 522, "provocation was not used in a technical sense peculiar to the law" and assumed the jurors were aware of the common meaning of the term.  (*Hernandez, supra*, 183 Cal.App.4th at p. 1334.)

Our conclusions are further supported by *People v. Jones* (2014) 223 Cal.App.4th 995, in which the trial court, as in this case, instructed the jury with CALCRIM Nos. 520, 521, 522, and 570.  (*Id.* at p. 999.)  In *Jones*, the defendant argued, similar to Janks, that the pattern instructions were likely to have misled the jury into concluding that the provocation standard to reduce murder to voluntary manslaughter also applied to reduce first to

19

second degree murder.  (*Id*. at p. 1001.)  The Court of Appeal in *Jones*, applying *Hernandez*'s reasoning, held the instructions were correct taken together and that defense counsel's failure to request a more specific, or further pinpoint, instruction forfeited his claim on appeal.  (*Ibid*.)

These authorities compel us to conclude that the trial court gave full and correct instructions on the law, and it was not required to give sua sponte any further instruction than CALCRIM No. 522 regarding provocation in the context of reducing first degree murder to second degree murder.

Because we conclude the court gave full and correct instruction on the effect of provocation in reducing an offense from first degree to second degree murder, or to voluntary manslaughter, we necessarily conclude that there is no federal constitutional error before us.  (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 633, 644–646 [a court's refusal to deliver CALCRIM Nos. 522 and 570 was federal constitutional error].)

c.      *Ineffective Assistance of Counsel*

Janks asserts that defense counsel's failure to object to the claimed instructional error constitutes ineffective assistance of counsel.  She argues "there could have been no reasonable basis for failing to ask for accurate and correct instruction on the issue" of provocation.  We conclude Janks has not met her burden to establish that defense counsel was ineffective.

A criminal defendant is constitutionally entitled to effective assistance of counsel.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684–685 (*Strickland*); *People v. Frye* (1998) 18 Cal.4th 894, 979.)  To establish ineffective assistance "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable

20

probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)  An ineffective assistance of counsel claim fails if the defendant makes an insufficient showing on either one of these components. (*Strickland*, at p. 687.)

"It is defendant's burden to demonstrate the inadequacy of trial counsel." (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)  "It is particularly difficult to prevail on an appellate claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai, supra*, 57 Cal.4th at p. 1009, italics omitted.)

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland, supra*, 466 U.S. at p. 697.)

In establishing ineffective assistance of counsel, "[a] defendant must prove prejudice that is a ' "demonstrable reality" not simply speculation.' [Citation.]  Prejudice requires 'a reasonable probability that a more favorable outcome would have resulted . . . , i.e., a probability sufficient to undermine confidence in the outcome.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)  Therefore, our inquiry is whether it is reasonably probable that the

jury would have convicted Janks of second degree murder, rather than first degree murder, if it had been instructed further on the plain meaning of provocation in CALCRIM No. 522.

In explaining the manner in which provocation can reduce first degree murder to second degree murder, our Supreme Court has emphasized that the provocation must occur under circumstances in which it negates the possibility that the defendant planned the killing in advance. "[W]here the evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately, the trial court is required to give instructions on second degree murder under this theory. The fact that heated words were exchanged or a physical struggle took place between the victim and the accused before the fatality may be sufficient to raise a reasonable doubt in the minds of the jurors regarding whether the accused planned the killing in advance." (*People v. Wickersham* (1982) 32 Cal.3d 307, 329 (*Wickersham*); see also *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705 ["The *Wickersham* court explained that the evidence of provocation must 'justify a jury determination that the accused had formed the intent to kill as a *direct* response to the provocation and had acted *immediately* . . . .' "].)

Janks contends that she was provoked leading up to murdering Merriman. She cites the discovery of the photos and her nerves and anxiety while wandering around the hardware store. We note, however, that Janks discovered the photos at least eight days before Merriman's death and described the discovery nonchalantly to Nuckolls and Jacob. Further, her anxiety in the hardware store was *after* she dosed Merriman—after she set her plan in motion. Following his drugging, Merriman became incoherent and unable to move even with the assistance of his walker; he could not even

explain to his neighbor that he fell, let alone confront Janks over his computer's screensaver. Nevertheless, she argues that when Merriman began to wake up, she believed she was no longer safe. However, Merriman never learned that Janks discovered the photos, and there is nothing in the record before us to suggest there was any heated exchange or confrontation that provoked Janks to act and asphyxiate Merriman. The ordinary meanings of the term "provoke" and "provocation" do not, in normal speech, apply to attacking an unwitting victim because she is afraid the victim might discern that she learned of his computer contents over a week earlier. When a defendant acts out of fear by making a preemptive strike towards someone, the defendant may reasonably be described as acting based on the emotion of fear, but the defendant may not reasonably be described as having "acted immediately" in "direct response" to any provocation. (*Wickersham, supra*, 32 Cal.3d at p. 329.)

In sum, because there was no evidence that Merriman did anything on the day of his death that provoked Janks to act rashly, impulsively, and without premeditation or deliberation, we conclude that even if the jury had received further instruction on the definition of provocation as contained in CALCRIM No. 522, there is no reasonable probability that the jury would have convicted Janks of second degree murder rather than first degree murder.

4.    *Cumulative Error*

Finally, having found no error, we do not consider Janks's claims of cumulative error. (See *People v. Martinez* (2003) 31 Cal.4th 673, 704.)

23

## DISPOSITION

The judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.